Wayne FAUST, et al.

v.

**METROPOLITAN GOVERNMENT OF NASHVILLE and Davidson County, et al.**

Court of Appeals of Tennessee, Middle Section, at Nashville.

Sept. 7, 2004 Session.

May 3, 2006.

Permission to Appeal Denied by Supreme Court Nov. 6, 2006.

---

Karl F. Dean, Director of Law, James L. Charles, Michael B. Bligh; Matthew J. Sweeney, April Y. Berman, Nashville, Tennessee, for the appellants, The Metropolitan Government of Nashville and Davidson County and the Metropolitan Employee Benefit Board.

George E. Barrett, James Bryan Lewis, Gerald E. Martin; David Komisar, Nashville, Tennessee, for the appellees, Wayne Faust, Robert Clark, and Nashville Police Civil Association, Inc.

C. Dewey Branstetter, Mark A. Mayhew, Nashville, Tennessee, for the appellee intervenor-plaintiffs, Owen Frame, et al.

## OPINION

WILLIAM B. CAIN, J. delivered the opinion of the court, in which WILLIAM C. KOCH, JR., P.J., M.S., joined. PATRICIA J. COTTRELL, J. did not participate.

This case involves eligibility for enhanced retirement benefits of certain employees of a local government. In 1996, civilian employees of the police department sued alleging that an administrative interpretation of eligibility requirements that allowed civilian employees of the fire department into the enhanced benefits plan

available only to "firemen" and "police-
men" deprived the police department civil-
ian employees of their rights to equal pro-
tection. Over the almost-eight-year course
of this litigation in the trial court, a num-
ber of orders were entered that are chal-
lenged in this appeal. The practical result
of these orders is that a large number of
individuals who were civilian employees of
the two departments at specified times,
which times differed for the two depart-
ments, were included in an enhanced bene-
fit plan for which they were clearly not
eligible by the terms of the ordinances
establishing the plan. For the reasons set
out below, we reverse the decision of the
trial court.

Like most governmental entities, the
Metropolitan Government of Nashville and
Davidson County ("the Metropolitan Gov-
ernment" or "Metro") provides within its
overall pension plan a special plan for em-
ployees with public safety duties. That
plan provides enhanced benefits, such as a
higher accrual rate and eligibility for re-
tirement at an earlier age. These en-
hanced benefits are justified as incentives
for initial and continued employment in
the often hazardous conditions faced by
such employees, as well as the physical
demands and stress-related consequences
of these jobs that make early retirement
desirable from both the employer's and
employee's perspective. Such enhanced
benefits are generally provided to those
employees who serve the public in law en-
forcement, fire fighting, and similar public
safety roles. *see* McQuillin, Municipal Cor-
porations (3d ed. rev.) § 45.13.05 (1992);
60A Am.Jur.2d Pensions and Retirement
Funds § 1633; *City of Chattanooga v.
Harris,* 223 Tenn. 51, 57, 442 S.W.2d 602,
604–05 (Tenn.1969) (recognizing that stat-
utes providing for a benefit to police offi-
cers and firefighters based upon their

greater risk of liability due to their pecu-
liar duties was an example of classification
based upon a reasonable difference be-
tween police officers and fire fighters, on
one hand, and other city employees on the
other.)

The case before us stems from the Met-
ropolitan Government's treatment of some
employees of the fire and police depart-
ments who are not police officers or fire-
fighters ("civilian employees") in terms of
their eligibility for the enhanced benefits
pension plan. Although the Metropolitan
Government and its predecessor govern-
ments have long maintained a pension sys-
tem with enhanced benefits for firefighters
and police officers, the dispute on appeal
arose as a result of the adoption of a new
government wide pension plan in 1995 and
the transition from the previous plan to
the new plan.

The old plan's provisions were designat-
ed as division A of the new plan and made
applicable only to employees hired before
July 1, 1995. Those employees were given
the option of remaining in division A or
applying to transfer to the new plan, desig-
nated as division B. There existed differ-
ences in benefit formulas under the two
plans, individual considerations applied,
and application for transfer had to be
made to the Metropolitan Benefit Board
("Board").

Like the old plan, the new plan had a
separate plan for public safety employees
which provided enhanced benefits to its
members, the Police and Fire Pension
Plan. Members of the old Police and Fire
Pension Plan hired before July 1, 1995,
like employees in the General Employee
Plan, could opt to remain in division A
under the old provisions or request a
transfer to the Police and Fire Pension
Plan in the new plan, division B.[1]

---

1. An example of the differences in the two plans is that participants in the division B

During the transition from the old plan to the new, questions arose concerning the eligibility of certain employees in non-fire-fighting positions in the Fire Department for inclusion in the Police and Fire Pension Plan. The Board made two decisions in the fall of 1995 that resulted in eligibility of 46 civilian employees of the fire department for the Police and Fire Plan of division B. Those decisions triggered this lawsuit.

In October of 1996, two civilian employees of the Police Department and the Nashville Police Civilian Association brought suit against the Metropolitan Government and the Board alleging that the Board violated the equal protection rights of more than 400 civilian employees of the Police Department when it allowed 46 civilian employees of the fire department to participate in the Police and Fire Pension Plan. Some time after filing the lawsuit, the Association applied to the Board for its members to be included in the Police and Fire Pension Plan. At its March 3, 1997, meeting, after hearing from its attorney, the Board's Pension Committee decided to defer the application until the pending lawsuit was decided.

By agreement of the parties, the case proceeded as a declaratory judgment action, with the parties framing the issue to be addressed by the court and submitting it on stipulated facts. On March 12, 1998, the trial court issued a memorandum opinion that gave a declaratory judgment addressing the issue as framed by the parties. After subsequent modifications and corrections, an order reflecting that declaration was entered on July 2, 1998, stating that the Board's 1995 interpretation of the

eligibility ordinance allowing civilian employees of the Fire Department to join the closed Police and Fire Pension Plan and its exclusion of civilian Police Department employees from that plan "violated the constitutional rights of similarly situation civilian employees of the Metropolitan Police Department ..."

The sequence of events in the trial court are interrupted at this point to provide a historical backdrop to facilitate consideration of the issues.

Since 1947, employees serving the City of Nashville and its successor, the Metropolitan Government, have been offered three succeeding pension systems. Any person employed when a new system came into effect had the choice of staying in his or her existing system or applying to transfer into the new system, but the old system was closed to new members when the new system became effective. Those employed after the new system came into effect were covered by the new pension system. Each of the three succeeding pension systems consisted of two basic plans—a General Employees Pension Plan and a more generous Police and Fire Pension Plan.

Between 1947 and 1963, the City of Nashville Civil Service Pension System operated under this dual system that provided a separate pension system for the police and fire departments. During this time, all employees of the police and fire departments were eligible for the Policemen's and Firemen's Pension Plan whether or not they were actually police officers or fire fighters.[2]

Fire and Police Pension Plan had the possibility of retiring as early as age 53, while members of the division A Fire and Police Pension Plan could retire as early as age 55.

2. *See* 1947 Tenn. Priv. Acts 246, § 48.

... the Civil Service Commission shall administer two (2) separate pension funds, held separate from each other, and all other municipal funds as follows:
(1) There shall be a Policemen's and Firemen's Pension Fund. This fund shall service the pensions to be paid the employees of the

In April of 1963, Davidson County and the City of Nashville were consolidated to form a new type of government by adoption of the Charter of the Metropolitan Government of Nashville and Davidson County ("Metropolitan Charter"). The Metropolitan Fire Department and the Metropolitan Police Department were both established on the effective date of the Charter.

The Charter preserved the rights of all existing employees in the county and city pension plans.[3] Metropolitan Charter sections 12.12, 13.09. The Charter required the adoption of new employee benefit plans that included retirement benefits, but left the specifics of such plans to legislative action through the Metropolitan Council. Metropolitan Charter sections 13.01, 13.06. The Charter created the Metropolitan Benefit Board to "administer, manage and coordinate the employee benefit plans of the metropolitan government...." Metropolitan Charter section 13.02.

### A. The 1963 Pension Plan

Pursuant to the directives of the Charter, the Metropolitan Council enacted through ordinance a pension plan for employees of the Metropolitan Government

that became effective September 1, 1964, but allowed entry or transfer into the plan for persons employed as of April 1, 1963.[4] That pension system was composed of a General Employee Pension Plan and a Police and Fire Pension Plan.[5] *see* Sections 3.32 and 3.36, of the Metropolitan Code of Laws ("MCL").

Under the 1963 Police and Fire Pension Plan, a member who was not specifically excluded by the Metro Charter and who had "credited fire and police service" was "eligible following termination to receive a pension in accordance with this chapter, provided he makes written application for such pension ..." MCL, Section 3.36.010. The term "credited fire and police service" was defined as "the sum of prior police and fire service and current police and fire service." MCL, Section 3.08.010. "Prior police and fire service" means all service prior to April 1, 1963 of a "uniformed fireman or a uniformed policeman." MCL, Section 3.08.010. Finally, "current police and fire service" is defined to mean "all continuous, uninterrupted service after April 1, 1963 ... during which time he is a fireman, or a policeman...." MCL, Section 3.08.010.

Police Department and the Fire Department. The monies for this fund are to be derived from not less than 2 percent nor more than 3 percent of the salary of each employee of the Police Department and the Fire Department, ...
(2) There shall be a Civil Service Employees' Pension Fund. This fund shall service the pensions to be paid all regular employees in the classified service, as defined herein, employed by the City of Nashville, other than employees of the Police and Fire Departments, specifically covered by the Policemen's and Firemen's Pension Fund, and teachers covered by the Teachers' Pension Fund.

**3.** This is consistent with Tenn.Code Ann. § 7–2–108(a)(17) which states "nothing ... in a

charter adopted pursuant to these provisions shall impair or diminish the rights and privileges of the **existing** employees under ... **existing** ... pension systems." (emphasis added).

**4.** Because the stipulations agreed to by the parties refer to the plan in effect since April 1, 1963, we will refer to this plan as the 1963 plan even though it was not enacted until 1964 pursuant to procedures mandated by the Charter.

**5.** "Police and Fire" and "Fire and Police" are used at differing times after 1963 in the course of MCL. This is of no practical significance.

With this brief insight into history we address the controlling issues in this case.

Metropolitan Government of Nashville and Davidson County is a single municipal corporate entity. It has divided itself into component parts and spoken in conflicting voices in this litigation. On April 8, 1991, the Department of Law of Metropolitan Government issued its legal opinion No. 91–05 answering an inquiry as to whether or not civilian employees of the Metropolitan Police Department were properly excluded from participation in the Police and Fire Pension Plan. This opinion stated:

1. Legal justification for exclusion of civilian employees of the Metropolitan Police Department and their counterparts in the Fire Department from participation in the fire and police pension plan is established by the employee benefit plan of the Metropolitan Government, as found in Sections 32–1–1 and 32–1–53 through 32–1–56 of the Metropolitan Code.

2. Since there is a legal basis for exclusion of certain employees of the Metropolitan Fire Department from participation in the fire and police pension plan, and since the Metropolitan Employee Benefit Board has not granted fire and police pensions to such employees, there does not appear to be an inconsistency; so question No. 2 is a moot point.

3. The employee benefit plan is established by ordinances passed by the Metropolitan Council and amendments or changes to the plan must be made by legislative enactments.

Expanding on the third question answered by Legal Opinion No. 91–05, the Metropolitan Law Department reasoned:

Your last question is how might the pension plan be changed to include civilian employees? The provisions that are now codified as Sections 32–1–1 and 32–1–53–56 of the Metropolitan Code were part of an ordinance adopted by the Metropolitan Council, Bill No. 064–320, which has been amended on several occasions. The exclusion of civilian employees of the Police Department from the fire and police pension plan is required by the Metropolitan Code of Laws. As it is a municipal administrative body, the Employee Benefit Board lacks the authority to waive a legislative mandate, and has no choice but to comply. *Watson v. Gatlinburg,* 699 S.W.2d 171 (Tenn.Ct.App.1985); *State v. Knoxville,* [203 Tenn. 622] 315 S.W.2d 115 (Tenn. 1958). Further, an employee has no right in provisions of a pension plan when that is denied by statute. *Bates v. Tennessee Consol. Retirement System, ex rel. Ashley,* 563 S.W.2d 192 (Tenn.Ct. App.1977). Because of these legal principles, the Metropolitan Employee Benefit Board lacks the authority to enroll civilian employees of the Police Department in the fire and police pension plan. That step can only be taken after change in legislation, which requires legislative action by the Metropolitan Council.

From the time of the adoption of the Metropolitan Government Charter in April of 1963 through all times relevant to this case, Metropolitan Charter, Section 13.05(d) provided that it was the duty of the Board to:

Construe any employee benefit plans adopted by the metropolitan government ... and to determine all questions that may arise thereunder, including questions relating to the eligibility of any person employed by the metropolitan government to become a member of any such employee benefit plan and the amount of benefit to which such person ... may become entitled thereunder.

Metropolitan Charter, Section 13.05(d).

Under the Metropolitan Government Charter prior to the new pension plan

effective July 1, 1995, qualifications for the more generous Police and Fire Pension Plan defined a "Policeman" as:

> ... an eligible employee who is a police officer in the department of police, as determined in accordance with the qualifications of a police officer prescribed by applicable rules of the civil service commission. An eligible employee in the department of police who is not a police officer shall not be deemed to be a policeman.

MCL, Section 3.08.010

A "fireman" was defined as:

> (c) 'Fireman' means an eligible employee who is in the uniformed fire services of any division of the department of fire of the metropolitan government in accordance with qualifications and requirements of the uniformed fire services of any division of such department of fire prescribed by applicable rules and regulations of the civil service commission. An eligible employee in the department of fire who is not in the uniformed fire services of any division of the department of fire shall not be deemed to be a fireman.

MCL, Section 3.08.011.

These provisions were in effect at the time of Metropolitan Legal Opinion No. 91–05 and remained in effect until the effective date of the new pension plan July 1, 1995. Under this new plan, division B applied to all persons hired on or after July 1, 1995, with division B retaining the definition of "policeman" as it had appeared in the 1963 plan which was designated in the new plan as division A. A new definition of "Fire fighter" was adopted in the new plan to be applied to division B. This definition provides:

> "Fire fighter" means an eligible employee in the "uniformed fire services" of any division of the department of fire, including those persons in the ambulance division who are certified as EMT's or paramedics. "Uniformed fire services" include those positions within the fire department dealing with fire suppression, fire prevention, fire training and fire inspection. Any questions as to whether an eligible employee will belong to the fire and police plan (Chapter 3.37) or the plan for credited employee service (Chapter 3.33) will be determined by the board. 'Civilian positions' within the department shall not be deemed to be fire fighters.

MCL, Section 3.08.012

The seeds of the present controversy were sown on September 11, 1995, when the Pension Committee recommended and the Board unanimously voted that in construing MCL Section 3.08.011(c) " 'Uniformed Services' be broadly interpreted to include all current employees of division A that were hired prior to July 1, 1995."

On December 11, 1995, the Board implemented its construction of September 11, 1995, by transferring 46 civilian employees of the fire department and apparently any other employees hired by the fire department prior to July 1, 1995, into division B Police and Fire Plan. The Board unanimously approved:

> i. Request by B.R. Hall, Sr. for the Board to consider allowing 46 individuals placed in Division A Police and Fire Plan to move to Division B Police and Fire Plan, through a grandfather provision.

> The Executive Secretary stated that the Committee had voted to recommend to the Board that 46 individuals placed in Division A Police and Fire Plan be allowed to move to Division B Police and Fire Plan and any employees hired as of July 1, 1995, would be in Division B Police and Fire Plan.

The actions of the Board of September 11, 1995, and December 11, 1995, evoked immediate demands by civilian support employees of the police department to be transferred into the Police and Fire Pension Plan. Receiving no satisfaction of their demands, employees of the police department filed this suit on October 16, 1996, claiming violation of their equal protection rights and due process rights as guaranteed by Article I, Section 8 and Article XI, Section 8 of the Tennessee Constitution and those same rights under the United States Constitution.

Metropolitan Government answered the complaint on November 22, 1996, admitting the actions of the Board of September 11, 1995, and December 11, 1995, but generally denying that Plaintiffs stated any cause of action against Metropolitan Government.

Not raising any question about the validity of the September and December 1995 acts of the Board but rather defending those acts against the original complaint, Metropolitan Government stipulated on May 7, 1997, among other things:

14) That as of March, 1997, there were 1,645 full-time employees of the Police Department of which 423 were non-uniform employees, and 1,222 were uniform officers, with only uniform officers afforded the opportunity to participate in the Police and Fire Pension Fund.

15) At the same period of time, (March, 1997) there were 1,177 employees of the Metropolitan Fire Department of whom 199 were Emergency Medical Technicians, 871 were uniformed fire fighters and 107 were civilians, all of those civilians hired prior to July 1, 1995 are eligible to participate in the Police and Fire Pension Funds, those hired as of July 1, 1995, are only eligible for Division B of the general pension plan.

On August 28, 1997, an agreed order was entered providing:

The parties, as evidenced by their signatures below, agree to submit the following question for determination by the Court; to-wit:

Did the Metropolitan Benefit Board's interpretation of the term "Uniform Fire Services" as set forth in Section 3.08.011 which allowed "civilian" employees in the Fire Department to join the now closed Police and Fire Pension Plan of Division A of the Metropolitan Employee Benefit System, violate the constitutional rights of similarly situated employees of the Metropolitan Police Department, if they were similar situated, to also be members of the Police and Fire Pension Plan of Division A of the Metropolitan Employee Benefit System?

In an extensive brief filed before the trial court on December 5, 1997, Metropolitan Government stringently defended the Board's actions of September and December of 1995, and on March 12, 1998, the trial court entered its memorandum deciding the stipulated issue in favor of Plaintiffs and concluding:

The Court concludes that Metro's actions through its Charter and ordinances establish a practice of treating police and fire employees the same as to pension benefits. Thus, these similarly situated persons were treated disparately when civilian fire employees were determined to be eligible for the pension plan but civilian police employees were denied that right. No reason was stated for the distinction. The record establishes that the only difference in these two civilian groups is that the civilian fire employees are uniformed, the police are not. The record establishes that their job duties are the same. The Court determines, then, that there is no

rational basis for the disparate treatment of these persons similarly situated.

The Court, therefore, declares that the Metropolitan Benefit Board's interpretation of the term "Uniform Fire Services" as set forth in Section 3.08.011 which allowed civilian employees in the Fire Department to join the now closed Fire and Pension Plan of Division A of the Metropolitan Employee Benefit System, violated the constitutional rights of similarly situated employees in the Metropolitan Police Department to also be members of the Police and Fire Pension Plan of Division A of the Metropolitan Employee Benefit System.

Following this decision by the Chancellor, Metropolitan Government did an about face, completely abandoning the issue which it had submitted to the trial court by stipulation and articulating a position consistent with Legal Opinion 91–05. On March 26, 1998, Metropolitan Legal Department, acting through counsel other than the counsel of record in this case, issued a letter to the Board which letter parrots the 1991 opinion letter No. 91–05. It states in pertinent part:

The following are the events that have given rise to the equal protection concerns expressed in this letter:

- In 1987, the Benefit Board ignored the underlying basis for having enhanced benefits for police officers and fire fighters by allowing one civilian employee of the Fire Department to participate in the Police and Fire Plan. Between 1963 and 1987, the Police and Fire Plan was limited to sworn police officers and personnel engaged in the fire suppression, fire prevention, fire training and fire inspection. Civilian police and fire employees were classified for pension purposes like similarly classified and situated

employees of the Metropolitan Government.
- In September, 1995, the Benefit Board again ignored the underlying basis for having enhanced benefits for police officers and fire fighters when it permitted all civilian employees of the Fire Department to be included in the Police and Fire Plan of Division A.
- In December, 1995, the Board permitted 46 civilian employees of the Fire Department to be included in the Police and Fire Plan of Division B, despite the express provisions of Division B. Division B provides that uniformed fire services *only* includes "fire suppression, fire prevention, fire training and fire inspection." Civilian fire employees do not fall into any of these categories.

These three actions are beyond the authority of the Board.

*1987 Action and September, 1995 Action:*

While the Metropolitan Charter gives the Benefit Board the authority to construe the benefit plan adopted by the Metropolitan Government, this does not give the Board the authority to rewrite the plan. The cardinal rule of construction requires that the interpretation of an ordinance not extend to amendment of the legislation. *Loftin v. Langsdon,* 813 S.W.2d 475 (Tenn.App.1991). When the Benefit Board interpreted the plan to permit civilian Fire Department employees to be moved into the Police and Fire Plan, the Board altered the interpretation that had been applied since 1963 and the clear intent that civilians were not to be included—effectively rewriting the Plan.

This action eliminated the rational basis for treating those employees in the Police and Fire Plan differently from the civilian employees in the Police Depart-

ment. This decision also eliminated the rational basis for permitting any enhanced benefits for police officers and fire personnel. As there is no rational basis for this exclusion, the result would require the inclusion of the Police Department civilians in the Police and Fire Plan. This could not be done by the Benefit Board since the Benefit Board is without authority to rewrite the plan.

Additionally, based on an analysis provided to the Board in 1996 by its actuary, inclusion of these employees results in the Police and Fire Plan being actuarially unsound. The Benefit Board was also without authority to construe the benefit plan in a way that would result in an actuarially unsound plan. Metropolitan Charter § 13.10.

*December, 1995, Action:*

The unambiguous language in § 3.08.012 of the Metropolitan Code excludes civilian employees in the Fire Department from the Police and Fire Plan of Division B.

"Fire fighter" means an eligible employee in the "uniformed fire services" of any division of the department of fire, including those persons in the ambulance division who are certified EMT's or paramedics. "Uniformed fire services" include those positions within the fire department dealing with fire suppression, fire prevention, fire training and fire inspection.... "Civilian positions" within the department shall not be deemed to be fire fighters. Metropolitan Code § 3.08.012.

Despite that unambiguous language, the Benefit Board moved the civilian employees in the Fire Department into the Police and Fire Plan of Division B. This action was in blatant disregard of the Metropolitan Code. As the Board has no authority to take actions that violate the

provisions of the Metropolitan Code, the December 1995, action of the Board was void *ab initio. General Portland, Inc. v. Chattanooga–Hamilton County Air Pollution Control Bd.*, 560 S.W.2d 910 (Tenn.App.1976); *Gay v. City of Somerville*, 878 S.W.2d 124 (Tenn.App.1994).

Since the Board lacked the authority to permit the Fire Department civilians to be included in either Division A or B of the Police and Fire Plan, the decisions to do so is *ultra vires* and therefore void. *City of Lebanon v. Baird*, 756 S.W.2d 236 (Tenn.1988). Since the action was *ultra vires* the fire civilians did not obtain any vested rights to remain in the Police and Fire Plans A or B. *Crumpler v. Board of Admin. Emp. Retirement System*, [32 Cal.App.3d 567] 108 Cal.Rptr. 293 (Cal.App.1973); *Flanigan v. West Virginia Public Employees' Retirement Sytstem [System]*, [176 W.Va. 330] 342 S.E.2d 414 (W.Va.1986); *Flisock v. State of Alaska, Division of Retirement Benefits*, 818 P.2d 640 (Alaska 1991). While the actions of the Benefit Board were void, it is likely that Metro will be estopped from altering the pensions and seeking refunds from the fire civilians who have already retired.

Considering the foregoing, it is the recommendation of the Department of Law that the Benefit Board rescind its earlier actions and remove all non-retired civilian Fire Department and Police Department employees from participation in Police and Fire Plans, Division A and B.

On March 28, 1998, Mayor Phil Bredesen likewise wrote a letter to the Board decrying the unfunded liability which would result from the action of the Chancellor concluding with:

6 Under the circumstances, the best course of action is for the Board to formally rescind the 1995 actions and

remove fire civilians from the Police and Fire Pension Plan (Plans A and B), and to allow the fire civilians to revert either to the general government Plan A, or to join the new general government Plan B. This is what I ask you to do.

7 I have been advised by the legal department that because the original action was outside the scope of the Board's authority, the civilian fire employees have not "vested" in the legal sense in the Police and Fire Pension Plan, and so this action can be taken.

8 I have had prepared a formal resolution which accomplishes this, which is appended as 'Attachment A'.

On March 27, 1998, a special called meeting of the Board was scheduled for March 30, 1998, at 12:15 p.m. to consider among other things:

6.a. Request by Mayor Bredesen that the Board rescind its action of September 11, 1995, and December 11, 1995, that placed Fire Civilian employees in the Police and Fire Pension Plan.

At 9:07 a.m. March 30, 1998, the affected civilian employees of the fire department filed an intervening complaint together with a motion for a restraining order, restraining the Board from acting on item 6.a. of its proposed agenda.

Obviously sensing that if Metropolitan Government successfully rescinded the September and December 1995 actions of the Board, their equal protection claims would be fatally affected, original Plaintiff civilian support employees of the police department at 9:05 a.m. March 30, 1998, filed a response in support of the fire civilian employee's intervening petition.

At 11:43 a.m. on March 30, 1998, Judge Thomas W. Brothers acting by inter-change for Chancellor Lyle issued a restraining order to the Board providing in pertinent part:

This restraining order includes, but is not limited to, any proposed action by the Metropolitan Employee Benefit Board to rescind the September 11, 1995, and the December 11, 1995, actions of the Metropolitan Employee Benefit Board as it relates to the uniformed personnel in the Support Division of the Metropolitan Nashville Fire Department.

On April 9, 1998, the court granted the intervening motion of the fire department civilian employees.

On April 29, 1998, Metropolitan Government filed its answer to the complaint of the intervenors, asserting the position that the Benefit Board action of September 11 and December 11, 1995, violated the Metropolitan Code and that:

7. The actions of the Benefit Board of September and December 1995 were illegal and, therefore, should be voided and not protected by injunctive relief as requested by the Intervenors.

On May 6, 1998, an agreed order extended the restraining order through May 21, 1998. A further order was entered on May 26, 1998, extending the restraining order to the date of a temporary injunction hearing scheduled for June 26, 1998.

On May 18, 1998, the pension committee recommended to the Board that it's actions of September 11 and December 11, 1995, be rescinded. After being advised by counsel that the Board could take such action, but under the pending injunction in the case could not implement same, the Board took action:

A vote was taken on the Pension Committee's recommendation of May 18, 1998 that the proposed resolution be

adopted which states: 1) That all Fire Department employees who were admitted to the Police and Fire Pension Plan by virtue of the Board's actions of September 11, 1995, and December 11, 1995, and have not been granted a pension thereunder are hereby restored to Division A of the General Employee Pension Plan; 2) That all Fire Department employees restored by this Resolution to Division A of the General Employee Pension Plan shall have until August 15, 1998, to voluntarily elect in writing to transfer participation from Division A to Division B, subject to written application approved by the Board. The written application to transfer to Division B must be received by the Board before August 16, 1998; 3) This Resolution shall not affect any Police and Fire Plan pension that has already been granted to any employee of the Fire Department who was admitted to the Police and Fire Plan by virtue of the Board's actions of September 11, 1995 and December 11, 1995. In order for any Police and Fire Plan pension previously granted to any civilian employee of the Fire Department to be affected by the rescission of the Board's actions of September 11, 1995 and December 11, 1995, specific action must be taken by the Board concerning the individual pension, and the motion was approved, with Larry Ashworth, Leighton Bush, Jr., Billy Lynch, Bob Nash, Gene Nolan and David Waller voting in the affirmative, B.R. Hall, Sr. and Phyllis D. West voting in the negative, and Pat Harris–Wingfield present but not voting.

On July 2, 1998, the trial court entered an order incorporating by reference its memorandum opinion of March 12, 1998,

declaring that the actions of Metropolitan Government violated the equal protection rights of original Plaintiffs. On July 13, 1998, the court enjoined the Board from implementing its May 18, 1998, resolution pending a final hearing of the case which was set for November 10, 1998.[6]

In view of the disposition we make of this case, it would serve no useful purpose at this stage to further delve into the tortuous and indeed almost mind-boggling journey through the trial court that occurred in the next four and one-half years. Suffice it to say that the trial court and all counsel struggled through seemingly endless proceedings to reach a final judgment.

It is painfully necessary to observe at this point that almost all of the problems in the trial court resulted from the inexplicable manner in which Metropolitan Government of Nashville, Davidson County chose to defend this action. Defending the original suit by civilian employees of the police department asserting equal protection violations, Metropolitan Government vigorously sought to uphold the actions of the Benefit Board in placing civilian fire department employees in the Police and Fire Retirement System. In its brief of December 5, 1997, Metro states:

Ultimately, the Benefit Board, in 1987 and again in September 1995, used its authority to construe the benefit system (see Metropolitan Charter, Section 13.05(d)) to place all the uniformed employees of the Fire Department, regardless of their jobs, into the Fire and Police Plan of Division A. In doing so, the Benefit Board applied the principles of liberal construction of benefit plans long contained in Tennessee's law of jurisprudence. *Collins v. Knoxville*, [180 Tenn. 483] 176 S.W.2d 808

---

6. Intervention by other individual members of the fire department civilian employees was granted by the court on July 27, 1998, with the intervening plaintiffs then withdrawing their requests for class certification.

(Tenn.[1944]); *Bates v. Consul. [Consol.] Retirement Sys., ex rel Ashley,* 563 S.W.2d 192 (Tenn.App.1977). Further, many of those employees' rights are arguably vested. *Blackwell v. Quarterly County Court,* 622 S.W.2d 535 (Tenn. 1981). In fact, the Benefit Board's action was probably the only rational action it could have taken.

. . .

It was rational, and probably required by law, for the Benefit Board to include all uniformed employees of the Fire Department in the Fire and Police Plan.

For the two and one-half years prior to the trial court's March 12, 1998, decision in favor of Plaintiffs, Metro continued to assert such position and indeed submitted a stipulated issue for decision by the court which implicitly assumed the validity of the Board's actions of September and December 1995.

Immediately after the adverse decision on March 12, 1998, Metro asserted for the first time the totally inconsistent position that the September and December 1995 actions of the Board were *ultra vires* and invalid and that the rule in *Blackwell v. Quarterly County Court of Shelby County,* 622 S.W.2d 535 (Tenn.1981) had no applicability.

■ If Metro were a private individual or private entity, it would be barred by judicial estoppel from taking such totally inconsistent positions:

> Under the doctrine of judicial estoppel "a party will not be permitted to occupy inconsistent positions or to take a position in regard to a matter which is directly contrary to, or inconsistent with, one previously assumed by him, at least where he had, or was chargeable with, full knowledge of the facts, and another will be prejudiced by this action." *Obion County v. McKinnis,* 211 Tenn.

183, 364 S.W.2d 356, 357 (1962); *see also Layhew v. Dixon,* 527 S.W.2d 739, 741 (Tenn.1975); *Werne v. Sanderson,* 954 S.W.2d 742, 745 (Tenn.App.1997).

*Marcus v. Marcus,* 993 S.W.2d 596, 602 (Tenn.1999).

There is much to be said for the observation of counsel for original Plaintiffs in the hearing of September 9, 1998:

> It's astounding to me that Metropolitan attorneys, who attend every board meeting of the Metropolitan employees' benefit board, can sit there year after year, meeting after meeting, and never raise the question that the board was acting ultra vires, never raised it. And then come to this Court and make the same argument, that what the board did was rational—and "rational" means within the law and you have the authority to act. What is someone irrational? Someone is acting outside of his authority of the law—that their action was rational in moving these civilian employees of the fire department into the pension plan and then come up here—and then lose that argument, and then shift their entire position, and come up here and say, Well, it was ultra vires.

Applying principles of estoppel against a municipal corporation, however, presents a far more complex problem than applying estoppel against a private person or entity. *Sexton v. Sevier County,* 948 S.W.2d 747, 750–51 (Tenn.Ct.App.1997).

After careful study of this voluminous record and the well articulated submissions of all parties, we conclude that three questions are determinative of the outcome of the case.

1. Were the actions of the Board of September 11, 1995 and December 11, 1995, *ultra vires* and ineffective?

2. Was the Board authorized to take its action of May 18, 1998, rescinding

the September 11 and December 11, 1995, actions?

3. Is Metropolitan Government of Nashville, Davidson County estopped to remove civilian employees of the police and fire departments from the Police and Fire Pension Plan?

The 1995 Actions of the Board

■ While Metropolitan Charter, Section 13.05 authorizes the Board to construe questions arising under the Metropolitan pension plans, and as a general rule, pension plans are construed in favor of applicants for pensions, *Collins v. City of Knoxville*, 180 Tenn. 483, 176 S.W.2d 808, 811 (1944), such board is not empowered to construe an ordinance in a manner inconsistent with the provisions of the ordinance itself. *Covington Pike Toyota, Inc. v. Cardwell*, 829 S.W.2d 132, 134 (Tenn.1992). Rules of statutory construction applicable to acts of the state legislative body are equally applicable to ordinances enacted by Metropolitan Government of Nashville and Davidson County. *State, ex rel. Moore & Assocs., Inc. v. Cobb*, 124 S.W.3d 131, 133 (Tenn.Ct.App.2003); *421 Corp. v. Metro. Gov't*, 36 S.W.3d 469, 475 (Tenn.Ct. App.2000).

Tested by ordinary rules of statutory construction, the 1995 actions of the Board are reduced to near absurdity. While MCL, Section 3.08.010 specifies that a "policeman" is the only employee eligible to be in the Police and Fire Pension Plan, the last sentence of the section provides that "[a]n eligible employee in the department of police who is not a police officer shall not be deemed to be a policeman." MCL, Section 3.08.011 describes a fireman as in the "uniformed fire services." It then contains the same identical concluding sentence as that contained in MCL, Section 3.08.010 by stating, "[a]n eligible employee

in the department of fire who is not in the uniformed fire services of any division of the department of fire shall not be deemed to be a fireman."

■ The actions of the Board in 1995 "construe" out of existence the entire class of employees mandated by the last sentence of MCL, Section 3.08.011. No action of the Metropolitan Council has authorized the Board to thus destroy this clear legislative classification. It is the duty of a court "to construe a statute so that no part will be inoperative, superfluous, void or insignificant, and the one section will not destroy another; and further to give effect to every word, phrase, clause and sentence of the act in order to carry out the legislative intent." *Tidwell v. Collins*, 522 S.W.2d 674, 676–77 (Tenn.1975); *see also City of Caryville v. Campbell County*, 660 S.W.2d 510, 512 (Tenn.Ct.App.1983).

> This court is to reconcile inconsistent or repugnant provisions of the statute and to construe the statute so as to avoid an interpretation that would render any of the language superfluous, void or insignificant. We are to give effect to every word, phrase, clause and sentence of the act in order to derive the legislature's intent. Each section is to be construed so that no section will destroy another. *Dingman v. Harvell*, 814 S.W.2d 362, 366 (Tenn.App.1991).

*Kellogg Co. v. Tenn. Assessment Appeals Comm'n*, 978 S.W.2d 946, 949 (Tenn.Ct. App.1998).

■ The subject matter of the provisions of the Metropolitan Code at issue in this case is the Metropolitan Police and Fire Pension Plan and the provisions of that Plan dealing with eligibility of police and fire department employees to participate in such a plan. The provisions of MCL, Section 3.08.010 dealing with the police department must be considered *in pari materia* with the provisions of MCL,

Section 3.08.011 dealing with employees of the fire department. "Statutes relating to the same subject or sharing a common purpose must be construed together ('*in pari materia*') 'in order to advance their common purpose and intent.'"

*Frazier v. East Tenn. Baptist Hosp., Inc.,* 55 S.W.3d 925, 928 (Tenn.2001) (quoting *Carver v. Citizen Utils. Co.,* 954 S.W.2d 34, 35 (Tenn.1997)).

While the authority of an administrative tribunal to resolve constitutional questions does not exist, *Richardson v. Tenn. Bd. of Dentistry,* 913 S.W.2d 446, 452 (Tenn.1995), both the Board and the courts in this case are construing a legislative enactment of the Metropolitan Council. Both the Board and the courts are bound to act in conformity with settled law:

> Indeed, to ascertain and give effect to the intention and purpose of the legislature is the basic rule of statutory construction. *Worrall v. Kroger Co.,* 545 S.W.2d 736 (Tenn.1977). This "[l]egislative intent or purpose is to be ascertained primarily from the natural and ordinary meaning of the language used, without forced or subtle construction that would limit or extend the meaning of the language." *Carson Creek Vacation Resorts, Inc., v. State Dept. of Revenue,* 865 S.W.2d 1, 2 (Tenn.1993). In determining legislative intent, statutes relating to the same subject or sharing a common purpose must be construed together ("*in pari materia*") "in order to advance their common purpose or intent." *Carver v. Citizen Utils. Co.,* 954 S.W.2d 34, 35 (Tenn.1997). Ultimately, we must seek the most "reasonable construction which avoids statutory conflict and provides for harmonious operation of the laws." *Id.; see also Cronin v. Howe,* 906 S.W.2d 910, 912 (Tenn.1995).

*LensCrafters, Inc. v. Sundquist,* 33 S.W.3d 772, 777 (Tenn.2000); *see also Lyons v. Rasar,* 872 S.W.2d 895, 897 (Tenn.1994); *Marion County Bd. of Educ. v. County Educ. Ass'n.,* 86 S.W.3d 202, 214–15 (Tenn. Ct.App.2001).

The rule relative to "*pari materia*" construction applies not only to separate statutes but also with equal force to separate provisions within a single statute.

> The different parts of a statute reflect light upon each other, and statutory provisions are regarded as *in pari materia* where they are parts of the same act. Hence, a statute should be construed in its entirety, and as a whole. All parts of the act should be considered, and construed together. It is not permissible to rest a construction upon any one part alone, or upon isolated words, phrases, clauses, or sentences, or to give undue effect thereto. The legislative intention, as collected from an examination of the whole as well as the separate parts of a statute, is not to be defeated by the use of particular terms.

73 Am.Jur.2d Statutes § 105 (2005); *see also Town of Mount Carmel v. City of Kingsport,* 217 Tenn. 298, 397 S.W.2d 379, 382 (1965).

As observed by Judge Blackmun prior to his appointment to the United States Supreme Court:

> "A construction that creates an inconsistency should be avoided when a reasonable interpretation can be adopted which will not do violence to the plain words of the act, and will carry out the intention of Congress." *United States v. Raynor,* 302 U.S. 540, 547, 58 S.Ct. 353, 356, 82 L.Ed. 413, *rehearing denied,* 303 U.S. 665, 58 S.Ct. 520, 82 L.Ed. 1123. "Words and phrases are often found in different provisions of the same statute, which, if taken literally, without any

qualification, would be inconsistent, and sometimes repugnant, when, by a reasonable interpretation—as by qualifying both, or by restricting one and giving to the other a liberal construction,—all become harmonious, and the whole difficulty disappears; and in such a case the rule is, that repugnancy should, if practicable, be avoided, and that, if the natural import of the words contained in the respective provisions tends to establish such a result, the case is one where a resort may be had to construction for the purpose of reconciling the inconsistency, unless it appears that the difficulty cannot be overcome without doing violence to the language of the law-maker." *New Lamp Chimney Co. v. Ansonia Brass and Copper Co.*, 91 U.S. 656, 663, 23 L.Ed. 336.

"The amendment was a part of the same act and passed at the same time that the amendment to subdivision b of § 23 was, and we must assume that they were intended not to conflict, but to be in accord, as provisions for different situations. In other words, that it was the intention that each should have its proper application, distinct from and harmonious with that of the other." *Wood v. A. Wilbert's Sons Shingle and Lumber Co.*, 226 U.S. 384, 389, 33 S.Ct. 125, 128, 57 L.Ed. 264.

See: *Mercantile–Commerce Bank & Trust Co. v. Commissioner of Internal Revenue*, 8 Cir., 165 F.2d 307, 310, certiorari denied 333 U.S. 868, 68 S.Ct. 791, 92 L.Ed. 1146.

*Brotherhood of Locomotive Firemen & Enginemen v. N. Pac. Ry. Co.*, 274 F.2d 641, 647 (8th Cir.1960).

The key phrase subject to construction in MCL, Section 3.08.011 is "uniformed fire services." The chief of the fire department, of course, has the authority as evidenced in this case to order all employees of the fire department to wear uniforms and thereby make them members of uniformed fire services, but only the Metropolitan Council, not the fire chief nor the Board, has the authority to make anyone other than a "fireman" a member of the "uniformed fire services" within the meaning of MCL, Section 3.08.011. By such a construction, "uniformed fire services" under MCL, Section 3.08.011 becomes synonymous with "policeman" under MCL, Section 3.08.010. The statutory scheme is thereby harmonized, and the last sentence of both sections of 3.08.010 and 3.08.011 are effective and consistent.

The ordinance construction evidenced by the administrative Board's action of September and December 1995 results in the effective destruction of the last sentence of MCL, Section 3.08.011 rendering that sentence of the ordinance meaningless and superfluous. This cannot be. *Tidwell*, 522 S.W.2d at 676 (Tenn.1975).

Indisputable in this record is the finding of the trial court on March 12, 1998, that:

With respect to pensions, the Metro Charter as well as Metro's ordinances, regulations and actions as to police and fire workers have classified and treated police and fire workers the same. The court finds, therefore, that civilian police and fire workers are in the same classification.

This Court has held:

We begin our consideration bearing in mind that in the construction of statutes the cardinal rule is to ascertain and give effect to the intent and purpose of the Legislature in relation to the subject matter of the legislation, all rules of construction being but aids to that end. *Anderson v. Outland*, 210 Tenn. 526, 360 S.W.2d 44; *Woodroof v. City of Nashville*, 183 Tenn. 483, 192 S.W.2d 1013;

*McCuiston v. Haggard,* 21 Tenn.App. 277, 109 S.W.2d 413.

A corollary of this rule is that in construing a statute the court will look to the underlying legislative purpose and, if possible, avoid a construction that would frustrate that purpose or one that would lead to an absurd result and give the statute a construction which promotes its purpose. *Anderson Fish & Oyster Co. v. Olds,* 197 Tenn. 604, 277 S.W.2d 344; *State v. Dyer,* 171 Tenn. 66, 100 S.W.2d 653.

Words of a statute, if inconsistent with its clear purpose, must yield to the legislative will as found from a consideration of the whole act. *Hilliard v. Park,* 212 Tenn. 588, 370 S.W.2d 829.

*Rippeth v. Connelly,* 60 Tenn.App. 430, 447 S.W.2d 380, 381–82 (1969).

Construing the words "policeman" and "uniformed fire services" as essentially synonymous leads to a clear and cohesive implementation of the legislative policy of equal treatment of employees of the two departments in a manner consistent with the history of successive police and fire pension systems. The construction by the Board in the September and December 1995 resolutions results in unequal treatment of civilian employees of the two departments and administratively amends the ordinance so as to effectively render meaningless the last sentence of MCL, Section 3.08.011. This cannot be done. *Loftin v. Langsdon,* 813 S.W.2d 475, 480 (Tenn.Ct.App.1991).

Since we hold that the administrative construction by the Board of MCL section 3.08.011 evidenced by the actions of September 11, 1995, and December 11, 1995, is clearly erroneous, we are impelled to depart from administrative construction. *Liberty Cash Grocers, Inc. v. Atkins,* 202 Tenn. 448, 304 S.W.2d 633, 635 (1957); *Westate Oil Co., Inc. v. Featherstone,* 208 Tenn. 631, 348 S.W.2d 299, 301 (1961); *Covington Pike Toyota, Inc.,* 829 S.W.2d at 134 (Tenn.1992); *S Cent Bell Tel. Co. v. Olsen,* 669 S.W.2d 649, 652 (Tenn.1984).

Throughout these proceedings, the trial court, original Plaintiffs, the intervenors, and indeed, Metropolitan Government of Nashville and Davidson County, prior to the time it executed its strategic withdrawal, relied heavily upon *Blackwell v. Quarterly County Court of Shelby County,* 622 S.W.2d 535 (Tenn.1981). Because *Blackwell* involved entirely legislative actions of the Shelby County Quarterly Court over a period of years and involved no issue of construction of an ordinance by an administrative body, *Blackwell* is not applicable to this case. In *Blackwell,* Chief Justice Harbison observed:

> Between the inception of the plan in 1949 and the enactment of the change now under consideration, the plan was amended on 36 separate occasions by appropriate resolutions of the County Court.
>
> . . .
>
> This 37th amendment to the plan resulted in a potential reduction of benefits for most employees, apparently for the first time in the 28–year history of the plan.

*Blackwell,* 622 S.W.2d at 538–39.

Had the September 11, 1995, and December 11, 1995, actions of the Board been legislative amendments to the retirement ordinances adopted by the Metro Council, *Blackwell* would indeed be a proper guide to the effects of such amendment. No legislative enactment is, however, involved in the issues before the Court, but rather only the construction of a legislative enactment by an administrative board. It cannot be said that Metro was ignorant of the difference. When question was raised in 1984 as to the inclusion of employees of

the Metropolitan ambulance division in the definition of "fireman," the minutes of the November 12, 1984, meeting of the Board disclosed:

At this time, Chief Davis asked to speak regarding Item 3–e., and that his recommendation was that since EMT's did respond to fires and were, at times, required to assist at fires, that they be considered under the Metro Police & Fire Pension Plan. After further discussion, Ms. Underwood moved to reconsider prior motion second by Mr. Gentry and approved unanimously. Ms. Underwood moved that in light of the description of duties by Chief Davis that the persons who are with the Emergency Medical Division, operating in the field, be considered as uniformed Firemen under Section 1.08 and that the Plan reflect this when it is redrawn, and that the Board's Legal Counsel research this matter and if necessary prepare an Ordinance to do so, second by Mr. Ragsdale and approved unanimously.

On December 4, 1984, Councilman Jay West introduced Bill No. 084–588 providing:

WHEREAS, some question has arisen as to whether or not employees of the Ambulance Division of the Metropolitan Fire Department are included in the definition of "fireman" for purposes of the employee benefit system created by Ordinance No. 64–320, as amended.

NOW, THEREFORE, BE IT ENACTED BY THE COUNCIL OF THE METROPOLITAN GOVERNMENT OF NASHVILLE AND DAVIDSON COUNTY:

*SECTION 1.* Section 32–1–1 of the Metropolitan Code of Laws is hereby amended by including the following definitional phrase as follows:

"*Ambulance Division Employees—* Wherever in this plan for employee benefits the term "fireman" is used, said term shall also include all employees of the Ambulance Division of the Metropolitan Fire Department."

*SECTION 2.* This Ordinance shall take effect from and after its passage, the welfare of the Metropolitan Government of Nashville and Davidson County requiring it.

This ordinance passed third reading on June 11, 1985, and was approved by Metropolitan Mayor Richard Fulton on June 14, 1985.

It results that the resolutions of the Board of September 11 and December 11, 1995, are *ultra vires* and void *ab initio. City of Lebanon v. Baird,* 756 S.W.2d 236 (Tenn.1988).

The second question posed in the case at bar is: Was the Board authorized to take its action of May 18, 1998, rescinding the September 11 and December 11, 1995, actions?

 The actions of the Board of September 11and December 11, 1995, resulted in a construction of the term "uniformed fire services" that contravened the legislative mandates of MCL, Section 3.08.011(c). Parties cannot gain vested rights in an erroneous interpretation by an administration agency of a legislative act. *Far Tower Sites, LLC v. Knox County,* 126 S.W.3d 52, 63–4 (Tenn.Ct.App.2003). An administrative agency has a right to revisit and reinterpret its previous construction of a legislative act whether or not the previous construction is erroneous, absent the intervention of vested rights. *Thompson v. Dept. of Codes Admin.,* 20 S.W.3d 654, 663 (Tenn.Ct.App.1999).

The parties in this case stand in much the same position as did the parties in *Far Tower Sites, LLC v. Knox County,* 126 S.W.3d 52 (Tenn.Ct.App.2003). In that

case Plaintiff applied for and acquired a building permit from the proper county authorities and, under such permit, expended large sums of money in the construction of a telecommunications tower. Neighboring land owners complained, and the facts made clear that the proper official of the county issuing the building permit had acted beyond his authority under the zoning ordinance. The Court of Appeals held:

Far Tower argues that these cases stand for the proposition that there are only two requirements to establish a vested right in a permit issued by a governmental entity: the issuance of the permit by the responsible governmental agency and the making of contracts and the incurring of substantial liabilities in reliance on the permit. It further argues that, since neither case expressly states that the permit must be *validly* issued, the validity of the issuance of the permit is immaterial.

Neither of the cited cases supports Far Tower's position for the simple reason that the invalidity of the issuance of the permit was not at issue in either case. Furthermore, neither case *expressly* holds that the vested rights doctrine applies whether the permit is validly issued or not. Thus, while we do not disagree with the holding or rationale of these cases, we hold that neither supports Far Tower's position or is of any help to us in addressing the effect of an invalidly-issued permit such as the one in the case at bar.

*Far Tower Sites,* 126 S.W.3d at 63–64.

After an extensive discussion of the facts and the law, the court followed the rule laid down in *Moore v. Memphis Stone and Gravel Co.,* 47 Tenn.App. 461, 339 S.W.2d 29, 35 (1959) and held:

In summary, we hold that the issuance of a COA was prerequisite to the issuance of a valid building permit; that Far Tower's failure to obtain a COA before seeking the permit renders the issued permit invalid and inoperative; and that Far Tower acquired no vested property right in and under the invalidly-issued permit.

126 S.W.3d at 66.

When the Board sought to rescind its September 11 and December 11, 1995, resolutions and remove ineligible fire department employees from the Police and Fire Pension Plan on October 18, 1998, the Board did in fact rescind the 1995 resolutions, but under the injunction issued by the trial court, could not implement such decision.

When the case came on for hearing on July 1, 1998, on the motion of the intervenors to extend the temporary restraining order into a temporary injunction, the trial court, in issuing the injunction, asserted:

However, The Court does determine that the intervenors have demonstrated a substantial likelihood of success on the merits that Metro is estopped from removing fire civilians from the plan, that the 45 civilians petitioned in 1995 to be grandfathered into Division B of the Police and Fire Plan is indicative of the significance of those benefits to those individuals and demonstrates to The Court that there was a substantial reliance of the 40 or so firefighters who have not yet retired. Metro did change its position some two years after they made the decision, and The Court determines that the intervenors have shown a substantial likelihood of success on the merits and prevailing at trial on an estoppel theory.

With respect to the other three factors that The Court has to consider, immediate and irreparable harm, balancing the equities in the public interest, The Court notes that Metro, for two

years, allowed the actions of the Benefit Board of including the civilian firefighters in Division B of the Police and Fire Plan to stand. And then, at first in this lawsuit, Metro took the position and defended the actions of the Benefit Board, but then when Metro received an adverse ruling from this Court concerning the policemen's equal protection claim, Metro changed its position and argued that the 1995 action of the Benefit Review Board flew in the face of 24 years of custom and practice. This inconsistency and position taken by Metro has eroded this Court's ability to rely upon representations and arguments made by Metro, such as their argument that the plan will be actuarially unsound if the temporary injunction is granted.

Moreover, the precipitous move by Metro and the Mayor to try to fix the situation just within, oh, less than 30 days of the issuance of the opinion by this Court, and that their fix was going back on a promise made two years ago to the firefighters undercuts Metro's claim that it had explored all options to solve both the equal protection dilemma, but not go back on a promise made by the Benefit Review Board. And The Court finds it problematic that Metro says that it has explored all options, given the short length of time and the precipitous move by Metro to get the Benefit Review Board to rescind its 1995 action. In short, Metro's credibility has seriously been eroded with this Court, and The Court is not persuaded by Metro's argument of actuarial unsoundness and fear of attempts of other Metro employees to be grandfathered into the plan, nor is The Court persuaded by Metro's argument that there are not other options out there.

Additionally, The Court has determined to give this matter an expedited trial date in November, so that Metro will have a resolution of these issues as soon as possible to make budget plans and other determinations.

Next, The Court notes that it is not substituting its judgment for the judgment of the Board. This was an argument that Metro made to The Court, and said that if this Court issued a temporary injunction, it would be usurping the position and discretion of the Board. The Court notes that the Board made its judgment or determination on May 18, 1998 to adopt a resolution that the fire civilians not yet retired would be returned to the General Pension Plan. By granting a temporary injunction in this case, The Court enjoins enforcement of that judgment pending a full trial, but The Court is not substituting its judgment for that of the Board.

While the actions of Metro in this litigation were obviously a source of irritation to the trial court—justifiable irritation—the Board had no power to make any promises to either the intervenors or original Plaintiffs. No rights vested in anyone as a result of the *ultra vires* resolutions of the Board in September and December of 1995. No immediate and irreparable harm to any vested rights of either original Plaintiffs or the intervenors justified the issuance of a temporary injunction. *State, ex rel. Agee v. Chapman,* 922 S.W.2d 516, 519 (Tenn.Ct.App.1995).

 In the absence of legislative sanction by the Metropolitan Council of the actions of the Board taken in September and December of 1995, Metropolitan Government has taken no valid action to transfer civilian employees of the fire department into the Police and Fire Pension Plan. Even if the actions have been those of the Metropolitan Council, equal protection problems could have been remedied

by removing the favored group from its favored position.

These decisions demonstrate that, like the right to procedural due process, see *Carey v. Piphus,* 435 U.S. 247, 266, 98 S.Ct. 1042, 55 L.Ed.2d 252 (1978), the right to equal treatment guaranteed by the Constitution is not co-extensive with any substantive rights to the benefits denied the party discriminated against. Rather, as we have repeatedly emphasized, discrimination itself, by perpetuating "archaic and stereotypic notions" or by stigmatizing members of the disfavored group as "innately inferior" and therefore as less worthy participants in the political community, *Mississippi University for Women v. Hogan,* 458 U.S. 718, 725, 102 S.Ct. 3331, 73 L.Ed.2d 1090 (1982), can cause serious non-economic injuries to those persons who are personally denied equal treatment solely because of their membership in a disfavored group. Accordingly, as Justice Brandeis explained, when the "right invoked is that to equal treatment," the appropriate remedy is a mandate of *equal* treatment, a result that can be accomplished by withdrawal of benefits from the favored class as well as by extension of benefits to the excluded class. *Iowa–Des Moines National Bank v. Bennett,* 284 U.S. 239, 247, 52 S.Ct. 133, 136, 76 L.Ed.2d (sic) 265 (1931).

*Heckler v. Mathews,* 465 U.S. 728, 739–40, 104 S.Ct. 1387, 79 L.Ed.2d 646, 656–57, (1395 1984).

As Metro has conceded that persons actually retiring before May 18, 1998 will not be disturbed and no party is before the Court to contest this suggestion, the particulars of implementing such concession can be determined upon remand.

The Board was empowered to rescind its prior resolutions, and the restraining order and temporary injunction prohibiting the implementation of its May 18, 1998, resolution were improperly issued.

We now must address the third and final question in this case: Is Metropolitan Government of Nashville, Davidson County, estopped to remove civilian employees of the police and fire departments from the Police and Fire Pension Plan?

Estoppel, particularly as it relates to original Plaintiffs, is an appealing argument under the facts of this case. The case does not, however, involve estoppel as to private persons but rather estoppel as to the actions of a municipal corporation. The Fourth Circuit Court of Appeals applying Maryland law in *Schaefer v. Anne Arundel County, Md.,* 17 F.3d 711 (4th Cir.1994) in a case involving a contract reasoned:

Schaefer thus argues that the County's custom and practice of delegating authority to the buyer should bind the County as a permissible interpretation by the County of its own regulations and that the County should be estopped from asserting any *ultra vires* defense.

In the context of private contract law, apparent authority will bind the principal to a third party according to the principal's manifestations to the third party. *See Restatement (Second) of Agency* § 8 (1958). But it is well-established that when a private party deals with a municipal corporation, the doctrine of apparent authority is modified to accommodate the public interest. As stated in *Gontrum v. City of Baltimore,* 182 Md. 370, 35 A.2d 128 (1943), "[a]lthough a private agent, acting in violation of specific instructions, yet within the scope of a general authority, may bind his principal, the rule, as to the effect of a like act of a public agent, is otherwise." *Id.* at 375, 35 A.2d 128

(quoting *Baltimore v. Eschbach,* 18 Md. 276, 282 (1862)). To conclude otherwise would amount to the establishment of the principle that the public can be deprived of public property contrary to their authority, based merely on a course of conduct, perhaps improper, followed by a public employee. The public interest will not accommodate such a notion. As the Maryland Court of Appeals has held:

> Generally, no estoppel as applied to a municipal corporation can grow out of dealings with public officers of limited authority where such authority has been exceeded, or where the acts of its officers and agents were unauthorized or wrongful. No representation, statement, promises or acts of ratification by officers of a public corporation can operate to estop it to assert the invalidity of a contract where such officers were without power to enter into such a contract on behalf of the corporation.

*Gontrum, 182 Md. at 378, 35 A.2d 128; see also [City of Baltimore v.] Chesapeake Marine Ry.,* 233 Md. [559] at 580–81, 197 A.2d 821 [ (1964) ]; *Maryland Classified Emp. Ass'n, Inc. v. Anderson,* 281 Md. 496, 501 n. 2, 380 A.2d 1032 (1977).

Not only does public policy limit the application of an estoppel against a public municipal corporation, but so does the public nature of the County's contracting procedures. Anne Arundel County's procedures for the disposition of public property are specified clearly in its laws, which are publicly accessible. A member of the public who deals with the municipal corporation and profits thereby is responsible for knowing whether the person he is dealing with has the authority to contract away public property. "It is a fundamental principle of law that all persons dealing with the agent of a municipal corporation are bound to ascertain the nature and extent of his authority." *Gontrum,* 182 Md. at 375, 35 A.2d 128. As the Maryland cases explain, "it seems more reasonable that an individual should occasionally suffer from the mistakes of public agents or officials, than to adopt a rule, which, through improper combinations and collusion, might be turned to the detriment and injury of the public." *Gontrum,* 182 Md. at 376, 35 A.2d 128 (quoting *Baltimore v. Eschbach,* 18 Md. at 282). Thus, persons who contract with the government do so at their peril when they fail to take notice of the limits of the agent's authority. *Id.* *Schaefer,* 17 F.3d at 714.

▮▮▮ Judge Susano, speaking for this court, in *Sexton v. Sevier Co.,* 948 S.W.2d 747 (Tenn.Ct.App.1997), made clear the law of Tennessee.

Generally speaking, the doctrine of estoppel is not favored under our law. *See, e.g., ACG, Inc. v. Southeast Elevator, Inc.,* 912 S.W.2d 163, 170 (Tenn.App. 1995); *Robinson v. Tennessee Farmers Mut. Ins. Co.,* 857 S.W.2d 559, 563 (Tenn.App.1993). Although the doctrine may be invoked against a county, *Greene County v. Tennessee Eastern Electric Co.,* 40 F.2d 184, 186 (6th Cir.1930), "very exceptional circumstances are required to invoke the doctrine against the State and its governmental subdivisions." *Paduch v. City of Johnson City,* 896 S.W.2d 767, 772 (Tenn.1995). *See also Elizabethton Hous. And Dev. Agency v. Price,* 844 S.W.2d 614, 618 (Tenn. App.1992).

In order to invoke the doctrine of equitable estoppel, a party must show the following:

> (1) his or her lack of knowledge and of the means of knowledge of the truth as to the facts in question;

(2) his or her reliance upon the conduct of the party who is estopped; and

(3) action by the invoking party based thereon of such a character as to change that party's position prejudicially.

*See, e.g., ACG,* 912 S.W.2d at 170; *Robinson,* 857 S.W.2d at 563; and *Gitter v. Tennessee Farmers Mut. Ins. Co.,* 60 Tenn.App. 698, 450 S.W.2d 780, 783 (1969). It is the burden of the party claiming estoppel to prove each of the above elements. *ACG,* 912 S.W.2d at 170; *Robinson,* 857 S.W.2d at 563; and *Bokor v. Holder,* 722 S.W.2d 676, 680 (Tenn.App.1986).

As a threshold matter, we have concluded that Judge Sexton's case does not satisfy the first requirement—lack of knowledge and of the means of obtaining knowledge of the truth—for the application of the doctrine of estoppel against Sevier County. As stated by the Supreme Court,

> [i]t is essential to estoppel that the person claiming it was himself not only destitute of knowledge of the facts, but without available means of obtaining such knowledge; for there can be no estoppel where both parties have the same means of ascertaining the truth.

*Rambeau v. Farris,* 186 Tenn. 503, 212 S.W.2d 359, 361 (1948). *See also City of Lebanon v. Baird,* 756 S.W.2d 236, 244 (Tenn.1988); *Escue v. Lux Time Division of Robertshaw Controls,* 225 Tenn. 533, 472 S.W.2d 228, 229 (1971); and *W.C. Early Co. v. Williams,* 135 Tenn. 249, 186 S.W. 102, 105 (Tenn.1916). Like everyone else, Judge Sexton is charged with knowledge of the law. *Davis v. Metropolitan Gov't of Nashville and Davidson County,* 620 S.W.2d 532, 535 (Tenn.App.1981). This is especially true in his case, given the fact that he is a judge. Under the circumstances of this case, it is clear that even if Judge Sexton did not have actual knowledge of the correct salary for his position, he certainly possessed the means of ascertaining that information. The Private Act creating the Trial Justice Court, and its amendments, as well as Chapter 15 of Title 16 of the Code, with its exclusion as to Sevier County, were readily available to him. *See City of Lebanon,* 756 S.W.2d at 244 ("The contents of a city charter are public and readily available to all who deal with a city."). *See also Escue,* 472 S.W.2d at 229. Therefore, Judge Sexton cannot rely upon the county's payments to his predecessor, or that entity's payments to Judge Sexton in excess of the salary provided for in the Private Act, to claim that the county is estopped to deny his entitlement to the salary supplements. Since he is presumed to know the salary provided by the Private Act and is presumed to know that Sevier County is excluded from the operation of the general law pertaining to general sessions courts, he "knew" that he was not entitled to the supplements under that general law. He cannot rely on the doctrine of estoppel. *Sexton,* 948 S.W.2d at 750–51.

The Board is an administrative authority, not a legislative authority. No administrative agency can exercise control over matters which the legislature has not seen fit to delegate to it and actions beyond the authority of the agency can have no force or effect. *Westly v. Cal. Pub. Employees' Ret. Sys. Bd. of Admin.,* 105 Cal.App.4th 1095, 1106, 130 Cal.Rptr.2d 149, 158 (2003).

The harsh consequences of this rule as relate to retirement benefits is dramatically evidenced by *Kellams v. Pub. Sch. Employes' Ret. Bd.,* 38 Pa.Cmwlth. 101, 391

A.2d 1139 (1978), *aff'd,* 486 Pa. 95, 403 A.2d 1315 (1979).

Retired teachers had been receiving retirement benefits based upon a miscalculation by the Board of "final average salary." This miscalculation resulted from the Retirement Board's action in allowing credit for years of service in states other than Pennsylvania. The controlling statute clearly provided that average salary was to be computed only on compensation received for years of service to Pennsylvania. The commonwealth court observed:

> Counsel for the Retirement Board candidly stated at oral argument that he was at a loss to account for the error in interpretation, but that there was no reason to suppose that plaintiffs participated in making the decision. Indeed, there can be no doubt that they were mislead by it and, in reliance thereon, in many if not all cases, have been placed in a more precarious financial position than they would have been if they had not relied on the incorrect information.

*Kellams,* 391 A.2d at 1141.

The court held that the original calculation by the Board was not in conformity with the controlling statute and that the doctrine of estoppel did not apply.

On appeal, the Supreme Court of Pennsylvania affirmed the holding of the trial court unanimously but then equally divided on whether or not past payments to retirees could be recovered from the retired employees. *Kellams,* 486 Pa. 95, 403 A.2d 1315 (1979).

Neither original Plaintiffs nor the intervenors can meet the test of estoppel as to a municipal corporation laid down in *Paduch v. City of Johnson City,* 896 S.W.2d 767, 772 (Tenn.1995), nor the general test for the application of estoppel laid down in *Sexton,* 948 S.W.2d at 751.

Without regard to the misleading effect of the defense to the original action asserted by Metro, all parties from the beginning of this case were charged with knowledge of the law. *Davis v. Metro. Gov't of Nashville and Davidson County,* 620 S.W.2d 532, 535 (Tenn.Ct.App.1981); *Sexton,* 948 S.W.2d at 750–51. All parties knew or should have known that the Metropolitan Council is the legislative body of the Metropolitan Government of Nashville and Davidson County and that the Board resolutions of September 11 and December 11, 1995, did not have the legislative sanction of the Metropolitan Council.

The Tennessee Supreme Court has held:

> The primary separation of powers provisions of the Tennessee Constitution are Article II, Section 1, which states that "the powers of the government shall be divided into three distinct departments: the Legislative, Executive, and Judicial," and Article II, Section 2, which states that "no person or persons belonging to one of these departments shall exercise any of the powers properly belonging to either of the others, except in the cases herein directed or permitted." The doctrine of separation of powers, as set forth in these two sections of the Tennessee Constitution, "is a fundamental principle of American constitutional government." *Underwood v. State,* 529 S.W.2d 45, 47 (Tenn. 1975).

*Town of S. Carthage v. Barrett,* 840 S.W.2d 895, 897 (Tenn.1992).

The Supreme Court further held in *Richardson v. Bd. of Dentistry,* 913 S.W.2d 446 (Tenn.1995) that:

> The powers of government, divided into the legislative, executive, and judicial branches, are separate and divisible. The legislative branch has the authority to make, alter, and repeal the law; the executive branch administers and en-

forces the law; and the judicial branch has the authority to interpret and apply the law. *State v. Brackett*, 869 S.W.2d 936, 939 (Tenn.Crim.App.), *perm. to appeal denied*, (Tenn.1993); Tenn. Const. Art. II, §§ 1, 2. Since the United State Supreme Court decision in *Marbury v. Madison*, 1 Cranch (5 U.S.) 137, 2 L.Ed. 60 (1803), it has been the sole obligation of the judiciary to interpret the law and determine the constitutionality of actions taken by the other two branches of government. *Tennessee Small School Sys. v. McWherter*, 851 S.W.2d 139, 148 (Tenn.1993). The Tennessee Constitution forbids an encroachment by one department upon the powers or functions of another. Tenn. Const.Art. II, § 2; *State v. Brackett*, 869 S.W.2d at 939. Thus, a legislative action vesting executive branch agencies with the authority to determine the constitutionality of statutes would violate the separation of powers doctrine. *See Williams v. Carr*, 218 Tenn. 564, 404 S.W.2d 522 (1966); *LaFever v. Ware*, 211 Tenn. 393, 365 S.W.2d 44, 47 (1963); *Peay v. Nolan*, 157 Tenn. 222, 7 S.W.2d 815, 816 (1928).

*Richardson*, 913 S.W.2d at 453.

Only action by the Metropolitan Council conforming to the September 11, and December 11, 1995, resolutions of the administrative board could have validated such resolutions and thereby triggered an equal protection claim. A judicially imposed doctrine of "legislation by estoppel" is foreign to American jurisprudence. *O'Brien v. Wheelock*, 184 U.S. 450, 489, 22 S.Ct. 354, 46 L.Ed. 636 (1902); *Obion County v. Coulter*, 153 Tenn. 469, 284 S.W. 372, 376 (1924); *Moore v. Tunica County*, 143 Miss. 821, 107 So. 659, 661 (1926); *Lloyd E. Clarke, Inc. v. City of Bettendorf*, 261 Iowa 1217, 158 N.W.2d 125, 129 (1968).

Metropolitan Government of Nashville, Davidson County, is not estopped to remove civilian employees of the police and fire departments from the Police and Fire Pension Plan.

The disposition we make of this case renders all but meaningless the last four and one-half years of trial court proceedings dealing with the intricacies of finding a remedy for equal protection violations. If we are wrong in our disposition of this case, Metropolitan Government of Nashville and Davidson County would be hard put to gainsay the findings of the trial judge of March 12, 1998, wherein she held:

> These similarly situated persons were treated disparately when civilian fire employees were determined to be eligible for the pension plan but civilian police employees were denied that right. No reason was stated for the distinction. The record establishes that the only difference in these two civilian groups is that the civilian fire employees were uniformed, the police are not. The record establishes that their job duties are the same.

Indeed, in the March 26, 1998, letter to the Board from the Metropolitan Department of Law, it is asserted relative to the September 11 and December 11, 1995, actions of the Board:

> This action eliminated the rational basis for treating those employees in the Police and Fire Plan differently from the civilian employees of the Police Department. This decision also eliminated the rational basis for permitting any enhanced benefits for police officers and fire personnel. As there is no rational basis for this exclusion, the result would require the inclusion of the Police Department civilians in the Police and Fire Plan.

In view of our holding on the *ultra vires* question and the further holding that even if life could be breathed into the 1995

actions of the Board, the further actions of the Board on October 18, 1998, resolved any equal protection questions, *Heckler*, 465 U.S. at 739–40, 104 S.Ct. 1387, further discussion of the equal protection issues are unwarranted.

Judge Cottrell participated in this case at oral argument but subsequent events not involving this case impelled her to recuse herself from further participation and she took no part in the judgment of the Court.

The judgment of the trial court is reversed, and the case remanded for further proceedings not inconsistent with this opinion. All costs in the trial court accrued between October 16, 1996, when the original complaint was filed and March 30, 1998, when the intervening petition was filed are assessed against Metropolitan Government of Nashville and Davidson County. All costs accruing thereafter in the trial court and in this court are assessed in equal parts to original Plaintiffs and intervening Petitioners.

PATRICIA J. COTTRELL, J. did not participate.