IN THE COURT OF APPEALS OF TENNESSEE
AT NASHVILLE
June 28, 2007 Session

**THE METROPOLITAN GOVERNMENT OF NASHVILLE AND
DAVIDSON COUNTY v. ALFRED O. HIBLER, II**

**Appeal from the Circuit Court for Davidson County
No. 03C-2126     Marietta M. Shipley, Judge**

**No. M2006-1633-COA-R3-CV - Filed on August 28, 2007**

The Metropolitan Government of Nashville and Davidson County ("Metro") brought this action alleging that Alfred O. Hibler, II, had failed to report earned income as required in order to avoid a reduction in the amount of his Metro disability pension, resulting in significant pension overpayments to Mr. Hibler. The income in dispute consisted of distributions of excess earnings of an S corporation owned by Mr. Hibler. The issue is whether this income is properly characterized as "earned income," defined by the Metro Code as including "wage or salary – not rent, interest, dividends or capital gains." After a trial, the trial court ruled that the distributions, labeled "draws" by the S corporation, were not earned income required to be reported to Metro for purposes of calculating Mr. Hibler's disability pension, and dismissed the action. We affirm the judgment of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Circuit Court Affirmed**

SHARON G. LEE, J., delivered the opinion of the court, in which HERSCHEL P. FRANKS, P.J., and D. MICHAEL SWINEY, J., joined.

Karl F. Dean, Kevin C. Klein, and John L. Kennedy, Nashville, Tennessee, for the Appellant, Metropolitan Government of Nashville and Davidson County.

Frank J. Scanlon, Nashville, Tennessee, for the Appellee, Alfred O. Hibler, II.

**OPINION**

*I. Background*

Mr. Hibler worked for the Metro Police Department from 1979 until 1993, when he suffered an on-the-job injury that left him permanently disabled, preventing him from continuing work as a police officer. After Mr. Hibler was injured, he applied for and received a disability pension from the Metropolitan Employee Benefit Board. The amount of Mr. Hibler's disability pension, $1,922.87

a month, is fixed and constant; however, the Metropolitan Code, which governs the calculation of a disability pensioner's benefit, provides that a pensioner's "allowable earnings," the amount of outside non-pension income he or she may earn without reducing the pension amount, increases over time. Every year he received a pension, Mr. Hibler had a calculated amount of allowable outside earnings, and any earnings over the allowable limit resulted in a reduction of his pension on a dollar-for-dollar basis. Mr. Hibler was required to report his earnings while disabled to Metro on an annual questionnaire form.

From 1993 to the present, Mr. Hibler has worked for his family's car wash business. At the time of trial, Mr. Hibler was president of two S corporations, H&H Car Wash, Inc., and U-Wash Auto Systems, Inc. Mr. Hibler owns 100% of the stock of H&H, which owns one car wash facility, and 41% of the stock of U-Wash, which owns six car wash facilities in the Nashville area. Mr. Hibler's sister, Alice Hibler Yokosuk, is the secretary of the corporations and is in charge of managing the day-to-day operations of the business. Mr. Hibler's involvement in the business consists primarily of periodically driving around to the seven car wash facilities to check if they are working properly and consulting with Ms. Yokosuk about management decisions. Mr. Hibler was paid a salary by H&H and/or U-Wash of roughly $6,000 per year for the years at issue in this case, except for 2001, when U-Wash paid him $28,000 in salary.

Beginning in 2001, Mr. Hibler began receiving distributions of excess earnings, or draws, from H&H. Mr. Hibler did not report his income from the draws paid by H&H on his annual disability questionnaires, which required him to report his "earned income." Metro filed this action on July 25, 2003, alleging that the draws paid by H&H were required to be reported on the questionnaires, that they applied toward the allowable outside earnings limit, and that Mr. Hibler's failure to report this income resulted in significant overpayments of his disability pension. Metro requested that the trial court order Mr. Hibler to repay approximately $185,322 in alleged overpayments for the years 1994 through 2002.

After a trial, the trial court ruled that under the Metro Code, a distribution of profits by an S corporation to a shareholder in the form of a draw is not classified as "earned income" for purposes of calculating the amount of a Metro disability pension. Therefore, the trial court held that "Mr. Hibler has not misrepresented his earned income nor converted pension funds received by failing to report any earnings or earned income to Metro." The trial court dismissed Metro's action.

## II. Issues Presented

Metro appeals, raising the following issues:

1. Whether the trial court erred in its conclusion that the Metro Code does not require a disability pensioner to report distributions of excess earnings, classified as "draws," by a wholly-owned S corporation, because the draws are not "earned income."

2.  Whether the trial court erred in refusing to apply the doctrine of "quasi-estoppel" to estop Mr. Hibler from arguing that his S corporation income was not required to be reported as "earned income" on the annual disability questionnaires because he classified it as "non-passive" on his federal income tax returns during the years at issue.

## III. Analysis

### A. Standard of Review

We review this non-jury case *de novo* upon the record of the proceedings below, with a presumption of correctness as to the trial court's findings of fact unless the preponderance of the evidence is otherwise.  Tenn. R. App. P. 13(d); *see also **Hass v. Knighton***, 676 S.W.2d 554 (Tenn. 1984).  When a trial court has seen and heard witnesses, especially where issues of credibility and weight of oral testimony are involved, considerable deference must be accorded to the trial court's factual findings. ***Seals v. England/Corsair Upholstery Mfg. Co., Inc.***, 984 S.W.2d 912, 915 (Tenn. 1999). There is no presumption of correctness with regard to the trial court's conclusions of law. ***Campbell v. Florida Steel Corp.***, 919 S.W.2d 26, 35 (Tenn. 1996); ***Presley v. Bennett***, 860 S.W.2d 857, 859 (Tenn. 1993).

### B. Classification of S Corporation Draws Under Metro Code

The Metro Code requires a disability pensioner such as Mr. Hibler to annually report "whether their earned income (i.e., wage or salary – not rent, interest, dividends or capital gains) exceeds their disability income." *Metropolitan Code of Laws*, § 3.28.100.   The Metro Code also requires the reporting of a disability pensioner's "earnings while disabled," which is defined as "all compensation, gain or profit of a disabled employee who works or engages in any business or occupation." *Id.* at § 3.08.010.   The amount of a pensioner's earnings is important for the calculation of his or her disability pension because if the earned income exceeds a certain amount of "allowable earnings," the person's pension is reduced on a dollar-for-dollar basis.

As stated, the income at issue in this case is income earned by an S corporation owned by Mr. Hibler. The Supreme Court, in ***Taylor v. Fezell,*** recently discussed how the income of an S corporation, an entity recognized under the federal tax code, is treated for income tax purposes:

> An S corporation's income passes through that corporate entity to the individual shareholders in proportion to their respective stock ownership. This passing through of income takes place for federal income tax purposes, regardless of whether the earnings of the corporation are retained to enhance the corporation's capital position. Thus, the shareholders of an S corporation are required to pay taxes on their apportioned shares of the corporation's earnings, regardless of the actual sums they are paid.

*Taylor,* 158 S.W.3d 352, 355-56 (Tenn. 2005).

Metro argues that Mr. Hibler's earned income exceeded his allowable earnings for the years 1994 to 2005,[1] and that the failure to report income from his wholly-owned S corporation, H&H Car Wash, resulted in overpayments of his disability pension. Mr. Hibler argues that the draws he received from H&H were not "earned income," but more in the nature of dividends or capital gains, and therefore should not be included in his "allowable earnings" under the Code.

The amount of income Mr. Hibler received during the years at issue is undisputed, and is shown by the following chart:

| Year | Allowable Outside Earnings | Gross Salary | Draw Amount Paid | Amount Reported |
|------|---------------------------|--------------|------------------|-----------------|
| 1994 | $9,316.02 | $6,000 | 0 | $5,000 |
| 1995 | $10,287.54 | $6,000 | 0 | $5,000 |
| 1996 | $11,121.06 | $6,500 | 0 | $5,000 |
| 1997 | $12,063.54 | $5,500 | 0 | $5,000 |
| 1998 | $13,201.56 | $6,000 | 0 | $5,000 |
| 1999 | $14,290.56 | $6,000 | 0 | $5,000 |
| 2000 | $14,843.52 | $7,500 | 0 | $4,500 |
| 2001 | $17,456.04 | $28,000 | $21,000 | $28,000 |
| 2002 | $20,716.56 | 0 | $37,793.10 | 0 |
| 2003 | $22,031.58 | $5,528.68 | $48,000 | $5,529 |
| 2004 | $22,698.60 | 0 | $48,000 | $6,000 |
| 2005 | $23,418.06 | $5,000 | $54,000 | N/A |

Mr. Hibler admitted that he had made certain mistakes in both reporting and classifying his income. As can be seen from the chart, Mr. Hibler reported less than his actual earned income from 1994 to 2000. Mr. Hibler (and his accountant, Joseph Spivey) also admitted that approximately $6,000 should have been classified as Mr. Hibler's salary for the years 2002 and 2004, both for

[1]Although the complaint was filed in 2003 and contained allegations involving only the years 1995 through 2002, the parties presented evidence, and arguments, to the trial court regarding Mr. Hibler's income through 2005. The complaint was never amended to include the years 2003 through 2005, but it is evident from statements of the parties and the trial court that the issue of Mr. Hibler's income for the later years was tried by consent.

federal income tax purposes and on his annual disability questionnaire. However, as Mr. Hibler argues, Metro incurred no damages from these errors, because the amount he actually earned was still less than his allowable outside earnings limit, and therefore the amount of his pension would remain the same if he had correctly reported his salary income. In 2001, the only year his reported salary exceeded the allowable earnings limit, Metro reduced Mr. Hibler's disability pension by the amount his salary exceeded the limit.

Metro argues that the amount of profit earned by H&H and U-Wash that was assigned to Mr. Hibler, as a stockholder, for federal income tax purposes should be imputed to him as earned income for purposes of calculating his disability pension. Mr. Spivey, the accountant for Mr. Hibler personally as well as the two S corporations, testified that the profits of an S corporation are assigned to the owners based on their percentage of ownership, and the shareholders pay federal income tax on the amount of profits assigned to them. Mr. Spivey explained that in many instances, however, the profits are not actually distributed to the shareholders. Whether the S corporation profits are distributed to the shareholder in the form of a draw, or whether the corporation uses the profits for other purposes, the individual shareholder pays federal income tax on his or her share. Although Mr. Hibler's tax returns show that he was taxed on his percentage of the profits earned by H&H and U-Wash, there is no evidence in the record that he actually received any profits other than the income classified as a draw in the above chart. Because there is no evidence that the profits made by H&H and U-Wash, and shown on Mr. Hibler's income tax returns, were Mr. Hibler's "earned income," there is no basis for imputing that income as "earned income" for calculating the pension, and the trial court correctly refused to do so. ***Cf. Taylor v. Fezell***, 158 S.W.3d 352, 354 (Tenn. 2005) (concluding that "absent a showing that the retained earnings are excessive or that an obligor is actually manipulating his or her income, the retained earnings of an S corporation should not be imputed as income to the sole or majority shareholder in calculating a child support obligation.").

As noted, Mr. Hibler was employed and paid a salary by U-Wash and H&H, and he served as president of both corporations. From 1993 until 2001, U-Wash paid his salary of approximately $6,000 per year. Beginning in 2002, H&H paid Mr. Hibler's salary. The work done by Mr. Hibler for the car wash business consisted primarily of driving to visit the seven car wash locations, driving his vehicle through the automatic washing systems to check if they worked properly, and visually inspecting the premises and reporting any problems. Mr. Hibler testified that he rarely got out of his vehicle on these visits, because his disability prevents him from much physical activity. His disability occurred during a police K-9 training exercise, when an accidental fall caused a partial severance of his spine and crushed three spinal discs. Mr. Hibler suffered a 40% loss of use of his legs below the knees and is unable to lift much at all, among other complications. Mr. Hibler testified that he visited the car wash locations three or four times a week, and the total time he spent to make a round of visiting all seven locations was three to four hours. Both Mr. Hibler and his sister, Ms. Yokosuk, testified that Mr. Hibler frequently consulted with Ms. Yokosuk on business and management decisions. They both testified without contradiction that Ms. Yokosuk was in charge of running the business, and that she made the final management decisions. Ms. Yokosuk testified that she has managed the business since her parents died in 2001 and 2002. She is paid a

total salary of $4,000 per month by the S corporations, and at the time of trial she had not taken any draws from the corporations.

As regards the issue of whether the income Mr. Hibler received as draws from the profits of H&H Car Wash should be classified as "earned income" for purposes of calculating his disability pension, the trial court answered that question in the negative, reasoning as follows:

> The court finds that there are two definitions that have to be analyzed. One is [Metro Code] § 3.08.010 defining "earnings while disabled" as "all compensation, gain, or profit of a disabled employee who works or engages in any business or occupation." The other definition describes what is to be contained in the annual questionnaire in [Metro Code § 3.28.100]: "If the person is employed, whether their earned income (i.e., wage or salary – not rent, interest, dividends or capital gains) exceed their disability income."

> If you look at the definitions as a whole, it is clear that the [Metro] Benefit Board was trying to capture income, generally considered to be a salary or earnings generated by the pensioner from an employer...Under no definition can S corporation income come under the definition of "earned income." If one is employed by an S corporation, that salary will be defined as W-2 income and included in [the] wages and salary line on the income tax return. If profits from a family business are distributed to the shareholders, that is not "earned income." Working at that same business is immaterial to the S corporation shareholder distribution.

We agree with this analysis, and affirm the holding that under the Metro Code, a distribution of profits by an S corporation to a shareholder in the form of a draw is not classified as "earned income" for purposes of calculating the amount of a disability pension, absent a showing that a pensioner is actually improperly manipulating his or her income to defraud the pension system. The annual questionnaires supplied by Metro specifically required Mr. Hibler to state his "earned income" for the year, and the Code specifically defines earned income as "wage or salary – not rent, interest, or capital gains." Mr. Spivey testified without contradiction that an S corporation draw is not earned income, but rather a return on investment in the nature of rent or a dividend. Further, as the trial court noted, the S corporation income is reported on the federal tax return "on the same line as rental income, royalties, partnerships, S corporations, trusts, etc. from the K-1 [form] on the front page of the return." Metro presented no evidence suggesting that the profits distributed from an S corporation in the form of draws are generally classified as "earned income," as is salary or wage income.

Under the particular facts presented in this case, it is important to note that Mr. Hibler, as president and sole shareholder of H&H Car Wash, had a great deal of discretion in deciding how

income from the business would be classified – whether as salary or as a draw from the corporation's profits. We emphasize that the shareholder's discretion in such a case must be exercised in an objectively reasonable manner, and not in such a way as to defraud the disability pension payor. In other words, if Metro had shown that Mr. Hibler routinely worked a regular 40-hour week for the business, for instance, and was purportedly paid only $6,000 per year as "salary," a different case would have been presented, and probably a different result reached. But in the instant case, the facts demonstrate that Mr. Hibler's salary was reasonable and not artificially low under the circumstances. The trial court so held, noting that the actual work Mr. Hibler performed for H&H and U-Wash was fairly minimal:

> Mr. Hibler testified that his only real connection with the business on a day to day basis is that he visits each of the sites to see if they are operating properly...His sister also confers with him on some decisions, but she has the actual say-so. It is quite clear, that his "inspection trips" are likely a way for him to feel useful, as he cannot repair any of the sites, lift any of the waste barrels or really do any significant work.
>
> \*　　　　　　　\*　　　　　　　\*
>
> To say that Mr. Hibler is actually employed by the car wash companies is really not being realistic. He simply helps out the business by inspecting the properties. He was paid a small salary in most years. If he reported more salary than was allowed in one year, that was in 2001, the year his father died and the year he got divorced. That year seems like an aberration.
>
> Thus the court finds that Mr. Hibler did not improperly report his "earned income" on his questionnaire.

We affirm the trial court's ruling that Mr. Hibler did not misrepresent his "earned income" on the annual disability questionnaires, because the draws paid by his S corporation, consisting of distributions of corporate profit, were not "earned income."

### C. Quasi-Estoppel Doctrine

Metro contends that the trial court erred by refusing to apply the doctrine of "quasi-estoppel" to disallow Mr. Hibler from arguing that the S corporation draws were not earned income because he classified the portion of S corporation profits allocated to him for federal income tax purposes as "non-passive" on his tax returns. As Metro recognizes in its brief, only one Tennessee court has made reference to the quasi-estoppel doctrine in an opinion. In the case of *In re Kelley,* the federal Bankruptcy Court for the Eastern District of Tennessee considered the quasi-estoppel doctrine in the context of the specific issue of whether, in a dischargeability action, a debtor who had reaped the benefit of a federal income tax deduction for payments made to a former spouse was precluded from later arguing in bankruptcy court that the payments did not constitute "alimony." *In re Kelley,* 216

B.R. 806, 808 (Bankr. E.D. Tenn. 1998). The *Kelley* court answered in the negative and refused to apply the quasi-estoppel doctrine. *Id.*

The near-total dearth of Tennessee case law referring to the quasi-estoppel doctrine suggests that Tennessee courts have not heretofore recognized the doctrine. Our courts have often stated that "generally speaking, the doctrine of estoppel is not favored under our law." *Faust v. Metropolitan Gov't of Nashville,* 206 S.W.3d 475, 497 (Tenn. Ct. App. 2006); *see also Hardcastle v. Harris*, 170 S.W.3d 67, 84 (Tenn. Ct. App. 2004) ("estoppels are not favored when they prevent parties from asserting claims or defenses to which they would otherwise be entitled."); *O'Brien v. Rutherford County,* 288 S.W.2d 708, 710 (Tenn. 1956) ("estoppels are not favored because they 'may exclude the truth, and no one should be deprived of setting up the truth unless it is in direct contradiction of his previous conduct and he has thereby induced another to act to his prejudice.'"); *Sturkie v. Bottoms*, 310 S.W.2d 451, 453 (Tenn. 1958) ("Estoppels are not favored in the law. Indeed, it has been said that they are odious.").

The *Kelley* court restated the quasi-estoppel doctrine as follows: "[t]he doctrine of quasi-estoppel forbids a party from accepting the benefits of a transaction or statute and then subsequently taking an inconsistent position to avoid the corresponding obligations or effects." *Id*. at 808 (citing *In re Davidson*, 947 F.2d 1294 (5th Cir. 1991) (internal quotation marks omitted)). While we do not rule out the possibility that a Tennessee court may recognize and apply the quasi-estoppel doctrine in a case where the facts clearly warrant it, we are not persuaded that this is such a case. This is because the proof presented by Metro did not clearly establish that (1) the position taken by Mr. Hibler in this litigation that the draws he received were not "earned income" is a directly inconsistent position with what he stated on his federal income tax returns; and (2) Mr. Hibler actually received any benefit from classifying his share of the S corporations' income as "non-passive." We also believe that the quasi-estoppel doctrine should not be applied as an absolute bar to Mr. Hibler's argument that his classification of the S corporation income as non-passive on his federal tax returns was an inadvertent mistake.

Mr. Spivey testified that classifying the S corporation income as non-passive was an error, stating as follows:

> THE WITNESS: Passive income is the one where you don't have any labor or effort involved in it. Nonpassive would be where you actually do stuff and it's because of your labors.
> THE COURT: But what's the difference between passive income and salary then?
> THE WITNESS: A salary, you usually earn. Passive income is usually something you just receive because of an investment.
> THE COURT: Well, then, it's hard to understand what nonpassive income is that is not earned income. Is that the draws?
> THE WITNESS: No, ma'am.
> THE COURT: What does this figure represent here?

THE WITNESS: That's the K-1 income.
THE COURT: The K-1 income from the S corporation?
THE WITNESS: Right. Yes, ma'am.
THE COURT: Okay. So it may or may not be income that you receive, but you're taxed on it.
THE WITNESS: Right.
THE COURT: Does he have any passive income in any of these returns?
THE WITNESS: I think he did in some of the others. I know one year – and I think this is the one where I had it coded as a nonpassive. And I'll be honest with you: I didn't really notice it when we did the return because basically it would be the same thing. It's all income, so he's going to pay tax on it whether it's passive or nonpassive.
THE COURT: Okay. So on this 1998, I guess, is this characterized properly?
THE WITNESS: It probably should have been passive because he wasn't actively – I mean, he didn't actually work that much to earn that. It was just part of his K-1.

From this testimony, it appears that what Mr. Hibler labeled as "non-passive" on his income tax return was not the income he personally received from the draws, but rather his taxable K-1 income, representing his share of the S corporations' income, irrespective of whether Mr. Hibler ever actually personally received a distribution of that K-1 income. Secondly, Mr. Hibler's claim that the draws were not earned income does not rest on an assertion that he was entirely "passive" relative to the income he received from H&H and U-Wash. Mr. Hibler admits he was, to a certain extent, "non-passive" in that he worked for the business and drew a salary. Further, notwithstanding his mistaken classification of the K-1 income as "non-passive," there is no indication that that income was ever classified or considered to be "earned income" for federal income tax purposes.

Additionally, Mr. Spivey's testimony suggests that Mr. Hibler did not receive any tax benefit from the erroneous "non-passive" classification of K-1 income:

THE COURT: Okay. Was it later characterized as passive?
THE WITNESS: I believe I did in other years, yes, ma'am.
Q: When did you first realize that it was improperly classified? Do you recall?
A: When this started.
Q: Okay. Changed since then?
A: I believe so.
      *        *        *
THE COURT: Could we just look at another tax return, like 2003?
THE WITNESS: I see 2003. It's listed as passive income.
      *        *        *

THE COURT: Okay. I think I see that. Okay. So then it's listed as passive.

THE WITNESS: Yes.

THE COURT: And that's after they sued Mr. Hibler, then you just relooked at that and decided really should be –

THE WITNESS: That's the way it should have been done every year.

THE COURT: Uh-huh.

THE WITNESS: Like I said, since it's – it's all income –

THE COURT: Uh-huh.

THE WITNESS: – it really hasn't mattered because it's going to get taxed no matter what you call it.

THE COURT: Unless you had some losses or something, some other passive losses. Would that come in –

THE WITNESS: Yeah, if you had some big losses or something like that, they would offset, which they don't normally have.

       *        *        *

THE COURT: So why did you change it to that?

THE WITNESS: That's what – it should have been passive all along.

THE COURT: Uh-huh.

THE WITNESS: And I just – on that one year, it got coded accidentally as – as nonpassive.

THE COURT: And it just stayed there? It just stayed there?

THE WITNESS: Pretty much...Because like I said, it was income, but I knew it was taxable; so it didn't really matter what you called it, to me.

THE COURT: Uh-huh. If – it's really only when there's a passive loss that we try to – any – any passive gain you would have, you can offset by passive loss, so then it's –

THE WITNESS: Right.

THE COURT: – Then it's more significant.

THE WITNESS: Right. And they didn't have losses, –

THE COURT: Right.

THE WITNESS: – so there wasn't really any –

THE COURT: Okay.

THE WITNESS: – need to worry about it.

It is apparent that the credibility of both Mr. Hibler's and Mr. Spivey's testimony was an important factor in the trial court's decision, and that the trial court credited their testimony. It is well settled that the "weight, faith and credit to be given to any witness' testimony lies in the first instance with the trier of fact and the credibility accorded will be given great weight by the appellate court." *Mays v. Brighton Bank*, 832 S.W.2d 347, 352 (Tenn. Ct. App. 1992). We affirm the trial court's decision refusing to apply quasi-estoppel to bar Mr. Hibler from arguing that the income at issue was not

required to be reported on Metro's annual disability questionnaire because it was not properly classified as "earned income."

### *IV. Conclusion*

For the aforementioned reasons, the judgment of the trial court is affirmed. Costs on appeal are assessed to the Appellant, Metropolitan Government of Nashville and Davidson County.

_____
SHARON G. LEE, JUDGE