IN THE COURT OF APPEALS OF TENNESSEE
AT NASHVILLE
April 15, 2010 Session

## BETTS NIXON v. CITY OF MURFREESBORO

Appeal from the Chancery Court for Rutherford County
No. 08-1435CV      Robert E. Corlew, III, Chancellor

No. M2009-01347-COA-R3-CV - Filed July 9, 2010

City employee brought suit to challenge her dismissal for violation of the city's drug and alcohol policy. The trial court affirmed the decision of the city's disciplinary review board. The employee argues that the decision of the disciplinary review board should be reviewed de novo, that the city is estopped by its actions from relying on the blood alcohol test results and from terminating her employment, that she was denied due process by the actions of the city manager and the disciplinary review board, that the city abused its discretion, and that the city's decision is not supported by substantial and material evidence. We have concluded, as did the trial court, that the decision of the disciplinary review board is properly reviewable under the standards set forth in the Uniform Administrative Procedures Act. Under those standards, we affirm the trial court's decision.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Chancery Court Affirmed**

ANDY D. BENNETT, J., delivered the opinion of the Court, in which PATRICIA J. COTTRELL, P.J., M.S., and RICHARD H. DINKINS, J., joined.

Van French, Murfreesboro, Tennessee, for the appellant, Betts Nixon.

James L. Weatherly, Jr., Nashville, Tennessee, for the appellee, City of Murfreesboro.

### OPINION

FACTUAL AND PROCEDURAL BACKGROUND

Betts Nixon worked for the City of Murfreesboro for 23 years and by all accounts was a dedicated and competent employee. Ms. Nixon developed the city's buildings and codes department and served as its director for many years.

The events that precipitated this lawsuit occurred on the morning of November 16, 2007. After receiving a report from an assistant city attorney that Ms. Nixon appeared to be under the influence of an intoxicant, the city personnel director met with Ms. Nixon, who consented to drug and alcohol testing. A screening breath test showed a blood alcohol level of 0.133; a confirming breath test twenty minutes later showed a blood alcohol level of 0.131. Ms. Nixon then requested a blood test, which was administered about an hour after the original screening breath test. Based upon the breath test results, Roger Haley, City Manager, placed Ms. Nixon on administrative leave.

Ms. Nixon's attorney sent a letter to Mr. Haley on November 30, 2007, along with the blood test results, which showed a blood alcohol level of 0.14.[1] After receiving these results, Mr. Haley sent a letter to Ms. Nixon informing her that his proposed disciplinary action was termination of her employment, subject to her right to a due process hearing. On December 4, 2007, Ms. Nixon requested a due process hearing.

The due process hearing was held before Mr. Haley on December 17, 2007. Ms. Nixon and the city were both represented by counsel. The city put on testimony from David Ives, the assistant city attorney who reported his suspicion that Ms. Nixon had been drinking; Sherry Carpenter, city personnel director; Leah Cathey, administrator at Concentra Medical Center, the facility contracted to do alcohol and drug testing for the city; and Sandra Johnson, the medical assistant who administered the tests to Ms. Nixon. Ms. Nixon presented testimony from Roy Nixon, her husband; Terra Wielgus-Green, an administrative assistant in the building and codes department; Donna Stem, Ms. Nixon's secretary; Gary Whitaker, an assistant to Ms. Nixon in the building and codes department; Monty Kapavik, a codes inspector; and Richard Boone, a codes inspector. Ms. Nixon herself testified concerning her alcohol consumption on the night of November 15 to 16, 2007. She acknowledged that she drank a 3-ounce vodka cocktail at around 5 p.m. on November 15, two large glasses of red wine with dinner, and a Bailey's cocktail at about 2:30 a.m. on November 16. Ms. Nixon denied having any other alcoholic drinks between 2:30 a.m. and the time of the testing, which began at 10:54 a.m. Ms. Nixon further presented the testimony of Dr. Michael Helton, her primary care physician, to support her position that she did not metabolize alcohol normally and that medications she was taking may have interfered with her ability to metabolize alcohol during the time period in question. In response to Ms. Nixon's proof, the city presented the testimony of Susan McGannon, city attorney; Joseph Aydelott, city planning director; and Dr. Howard Taylor, a toxicologist.

---

[1]According to testimony before the disciplinary review board, these blood test results are consistent with the breath test results.

At Ms. Nixon's request, Mr. Haley postponed his decision concerning her case to allow her to submit additional evidence. Ms. Nixon subsequently submitted to Mr. Haley a hair spray sample, which she claimed explained the smell of alcohol detected by Ms. Carpenter and Ms. McGannon; an article to support the theories about which Dr. Helton had testified; and the results of a blood test performed at Ms. Nixon's request on November 30, 2007. Ms. Nixon declined to take an alcohol elimination test proposed by Dr. Taylor.

In a letter dated January 16, 2008, Mr. Haley set forth findings of fact and concluded that Ms. Nixon had violated the city's alcohol policy. He notified Ms. Nixon that she was terminated as a city employee effective that day. In accordance with the city charter, Ms. Nixon exercised her right to appeal her termination to the city's disciplinary review board ("DRB").

## Disciplinary Review Board

The hearing began on April 16, 2008, before seven members of the DRB and Jim Duncan, Hearing Officer. The city's first witness was David Ives, assistant city attorney, who testified that he and Ms. Nixon were scheduled to attend a hearing in court on the morning of November 16, 2007, and that Ms. Nixon was to be the city's chief witness. When he met with Ms. Nixon that morning prior to the hearing, Mr. Ives observed that Ms. Nixon's eyes were watery, her speech was slightly slurred, and that she exhibited "hesitancy, a deliberateness in making responses." He also noted that her physical movements were deliberate and slow. Mr. Ives further testified about what he perceived to be Ms. Nixon's fumbling, awkward behavior when asked about a file. Although he had some misgivings about Ms. Nixon's ability to appear as a witness, Mr. Ives elected to proceed to the courthouse for the hearing.

As it turned out, the hearing was continued because the judge recused himself, and Mr. Ives and Ms. Nixon returned to their city offices. Upon arriving back at his office at around 10:00 a.m., Mr. Ives went to talk to the city attorney, Susan McGannon, about what had happened in court and his concerns about Ms. Nixon's unusual behavior. He told Ms. McGannon that he thought Ms. Nixon had been drinking that morning. Ms. McGannon called in the personnel director, Sherry Carpenter, and Mr. Ives explained what he had observed to her. At that point, Ms. Nixon was summoned to Ms. McGannon's office and informed about Mr. Ives's concerns. Mr. Ives then returned to his office and made a written statement concerning his observations of Ms. Nixon that morning.

The next witness for the city was Sherry Carpenter, the personnel director, who testified about the city's policies and procedures with respect to alcohol and drug use and misuse and about her contact with Ms. Nixon on the day in question. After Ms. McGannon

summoned Ms. Nixon to her office, Ms. Carpenter informed Ms. Nixon of Mr. Ives's belief that she was under the influence of drugs or alcohol. Ms. Nixon responded that she had not been drinking but had been taking pain medication for pain in her jaw. As to her own observations, Ms. Carpenter testified that Ms. Nixon's eyes were "moist, somewhat glassy" and that "[s]he was not as responsive to me as I have found Betts to be in the past." Ms. Carpenter also noticed that Ms. Nixon had a slight slur, "almost like a cottonmouth effect." Ms. Carpenter further stated that, when she leaned down to give Ms. Nixon the testing consent forms for her to sign, she smelled "alcohol about her person." It was decided that Ms. McGannon would take Ms. Nixon to the testing facility. Ms. Carpenter stated that the smell of the hair spray provided by Ms. Nixon was not the smell she had noted on Ms. Nixon on the morning at issue.

Susan McGannon, the city attorney, testified about the events of November 16, 2007, including the report made to her by Mr. Ives concerning Ms. Nixon's behavior and appearance that morning and her meeting with Mr. Ives, Ms. Carpenter, and then Ms. Nixon. When asked about her impressions of Ms. Nixon's appearance when she came into Ms. McGannon's office, Ms. McGannon stated that she noticed Ms. Nixon's eyes looked "atypical," "a little watery, glassy, popeyed." She further observed that Ms. Nixon "was speaking very slowly and nonreactively."

Ms. McGannon testified that she transported Ms. Nixon to the testing facility. After Ms. Nixon tested positive for alcohol, she expressed to Ms. McGannon that she did not understand the results because she had not had anything to drink for more than four hours.[2] Ms. Nixon stated that she had Bailey's at 3:00 a.m. Ms. McGannon sat down with Ms. Nixon and discussed the disciplinary procedures. Ms. Nixon requested a blood alcohol test, which was not part of the city's testing protocol. When she moved next to Ms. Nixon to answer a question about the city's procedures, Ms. McGannon smelled alcohol on Ms. Nixon. She testified that the hair spray she was asked to smell at the hearing was not the same smell she detected on Ms. Nixon that day.

Leah Cathey, the Concentra administrator on November 16, 2007, testified about the testing procedures and the results of Ms. Nixon's breath tests. She stated that the results of the drug test administered to Ms. Nixon were negative for the five drugs tested. Ms. Cathey was called to the front desk at Concentra when Ms. Nixon requested a blood test. She testified that this was her first interaction with Ms. Nixon. Ms. Cathey testified that she smelled alcohol on Ms. Nixon's breath and that Ms. Nixon "seemed nervous, dry mouth."

---

[2]The city's drug policy prohibited an employee from using alcohol "for four (4) hours before reporting to duty or while on call for duty."

-4-

Sandra Johnson, the Concentra employee who administered the breath tests to Ms. Nixon, testified about her observations that morning. Ms. Johnson stated that Ms. Nixon "smelled of alcohol."

Joseph Aydelott, the city planning director, testified as the next witness for the city. He described several planning commission or city council meetings when he thought he smelled alcohol on Ms. Nixon. Of greatest concern to Mr. Aydelott was a planning commission meeting in May 2006 at which two items involving Ms. Nixon were discussed. The meeting lasted late into the evening. At some point, Ms. Nixon advised Mr. Aydelott that she had reached an agreement with the company involved in one of the agenda items, a signage dispute. When she talked to Mr. Aydelott about the agreement, he noticed an odor of alcohol and thought "she's a little bit impaired." He thought that "[h]er eyes weren't quite right." When Ms. Nixon's item came before the commission and she made her presentation, Mr. Aydelott "could tell that she was not in her ordinary, sober condition." He observed that Ms. Nixon's voice was wavering and "her eyes were not right." The next day, Mr. Aydelott talked to Mr. Ives about his observations. A few days later, Mr. Aydelott informed Mr. Haley of his concerns.

At this point in the hearing, the hearing officer was informed by the members of the DRB that they wished to invoke a section of the DRB's rules of procedure by which, in cases involving complex legal issues or likely to involve more than five hours of testimony, the DRB could appoint the hearing officer to hear and decide the case. Neither party raised any objection to this process.

The hearing continued on June 12, 2008, with the cross-examination of Mr. Aydelott. The city next put on the city manager, Mr. Haley, as a witness, and he described his history with Ms. Nixon and his decision to terminate her employment with the city after the due process hearing.

Ms. Nixon then began presenting her proof in the case. Terra Green, an administrative support specialist for the city who worked closely with Ms. Nixon, testified that she was with Ms. Nixon for a substantial amount of time on November 16, 2007. She was involved in the preparations for going to court that morning and went to the courthouse with Ms. Nixon. Ms. Green did not observe anything to suggest that Ms. Nixon was under the influence of alcohol or impaired. She did not smell alcohol.

Bonnie Stem, Ms. Nixon's secretary, testified that she had worked for Ms. Nixon for 14 years and had never seen any indication that she had any alcohol problem. She testified about her interactions with Ms. Nixon on the morning of November 16, 2007. Ms. Stem did

not notice anything unusual about Ms. Nixon's appearance or behavior and did not detect any odor of alcohol.

Richard Boone, a codes inspector, testified about his interactions with Ms. Nixon on November 16, 2007. Mr. Boone did not notice anything unusual about Ms. Nixon's behavior or appearance that morning and did not smell alcohol. That morning, Ms. Nixon told Mr. Boone that she was not feeling well and had taken a prescription medication due to pain in her jaw.

Dr. Thomas Helton, Ms. Nixon's primary care physician, testified that she gave him the following account of her drinking on the night prior to the morning of November 16, 2007: "a three-ounce glass of vodka, eight-ounce glass of . . . Mott's, six-ounce glass of wine, and a–four ounces of Bailey's." He opined that, with the amount of alcohol Ms. Nixon reported drinking, the blood alcohol levels shown by the tests on the morning of November 16, 2007 were not consistent with a normal metabolism. He stated that there can be variations in the level of alcohol dehydrogenase enzymes in a person's body that affect the rate at which he or she metabolizes alcohol. When asked whether the variation in the dehydrogenase enzyme could be measured, Dr. Helton stated: "Not that I can find in literature. It's just clinically not obtainable at this time. It's done through research only." Dr. Helton submitted two scholarly articles to support his statements concerning variations in the dehydrogenase enzymes and was questioned extensively about the import of the articles. Dr. Helton also testified that Ms. Nixon was taking Darvocet, a medication containing Tylenol, and that Tylenol could have an effect on the rate a person metabolizes alcohol. He further stated that, according to some literature, "Tylenol can actually inhibit the production of alcohol dehydrogenase."

The crux of Dr. Helton's testimony can be found in the following exchange:

Q. Now, based on the history that Ms. Nixon provided to you, did you form an opinion as to what was the most likely cause of her high blood alcohol level on the date in question?

A. My theory was that she had either a combination of a variant in her alcohol dehydrogenase levels that caused her to metabolize more slowly than the average person would, in addition to the medication she was taking, which also affected her alcohol dehydrogenase levels, and the activity of those enzymes in the cytochrome P450 system that she used to metabolize the rest of her alcohol.

On cross-examination, Dr. Helton acknowledged that another possible explanation for the levels of blood alcohol shown in the tests could be that Ms. Nixon consumed five to six ounces of alcohol at 9:00 or 10:00 that morning. While admitting that this explanation was "a possibility," Dr. Helton stated, "I don't want to incriminate my patient here."

Sheila Lilly, a department coordinator for the city's department of buildings and codes, testified that she interacted with Ms. Nixon on a regular basis and found her to be "a really great boss." Ms. Lilly had never known Ms. Nixon to be under the influence of alcohol while doing the city's business.

Dr. David Stafford testified on behalf of Ms. Nixon as an expert in forensic toxicology. He testified about scientific treatises regarding the role of alcohol dehydrogenase and the variability in alcohol elimination rates. Dr. Stafford answered hypothetical questions regarding the effect of different elimination rates on the level of alcohol remaining in a person's blood if the person drank the amount of alcohol described by Ms. Nixon. Dr. Stafford also stated that alcohol accumulation, "the buildup of alcohol concentration over a period of time," can occur.

Dr. Stafford gave the following testimony with regard to Ms. Nixon's case:

Q. And, Doctor, based on your review of the facts and testimony in this case, did you form an opinion as to whether [alcohol dehydrogenase deficiency] was a factor in this case?

A. Well, I looked at some of the inconsistencies. For example, she could not have achieved a blood alcohol concentration of about a .13 at 11 o'clock the following day based on what she indicates that she drank the day before.

Q. Assuming a normal metabolical rate?

A. Yes. Correct.

Q. Assuming the fact that, when she reported to work that morning, she was considered able to go to trial and go to court; that several witnesses testified that she saw no evidence of impairment or intoxication; that some said that they felt her eyes looked different, and that she walked more carefully; but that she went to trial ready to appear as a witness as the primary trial representative for the City; the fact that she–no time while at work was she observed consuming any alcohol; and that, in fact, her testimony that she was with somebody and her door was open the entire time she was there–assuming those

facts as true, Doctor, do you have an opinion as to what is the most probable explanation for her blood alcohol level?

A. The most probable explanation that I can see would be that her elimination rate was somewhat slower than normal.

On cross-examination, Dr. Stafford acknowledged that there were other possible explanations for Ms. Nixon's test results if she was not being truthful and that his conclusions were based on the assumption that Ms. Nixon's statements were truthful. He was questioned further about the possible effects of a deficiency in eliminating alcohol:

Q. What would prevent her from eliminating the alcohol?

A. If there were a deficiency in the alcohol dehydrogenase.

Q. Wouldn't it have to be a deficiency below anything you've ever heard of?

A. I haven't considered that, and I don't know.

Q. . . . [T]hese quantities [of alcohol consumed in prior days], as they were disclosed by her, would not result in her having any blood alcohol level when she begins consuming on the next day.

A. She might.

Q. She might. So, then, it could have some effect on her?

A. Yes.

Q. Let's explore the "might." What do you mean by that?

A. What I'm saying is, if she did not eliminate all of the alcohol before she began consuming again, then the accumulation would be–there would be an addition to the accumulation, and so she could have more than that.

Q. Well, under what scenario would she not eliminate these amounts of alcohol?

A. Well, that's what I indicated. If she had a alcohol dehydrogenase deficiency, she might not eliminate all of the alcohol that she consumed.

Q. Is it your testimony that, if her alcohol dehydrogenase enzyme was such that her elimination rate was the absolute lowest .005, that she would not have eliminated the quantities of alcohol that are reflected in Exhibit 17 on a daily basis before she went to the next consumption?

A. That would be possible.

Q. Possible. Is that a possible explanation for the .133 at 10:54 a.m. on 11/16?

A. It's not very probable, but I can't say it couldn't happen.

Q. You certainly couldn't say, within a degree of professional certainty in your field, that that's the reason that she recorded a .133 at–on November 16th.

A. That's correct.

Dr. Stafford further testified that he did not think the medications Ms. Nixon was taking would have affected the rate at which she eliminated the alcohol from her system. Although Tylenol in sufficient quantities could slow down the rate of elimination of alcohol, Dr. Stafford did not think the amount of Tylenol in the medication taken by Ms. Nixon would have a dramatic effect. He acknowledged that Ms. Nixon's test results could be explained by the consumption of alcohol during the office hours that morning. Dr. Stafford thought that it was possible to do testing to evaluate Ms. Nixon's elimination rate.

Ms. Nixon's husband, Roy Nixon, testified about his wife's consumption of alcohol on the night before the testing.

Ms. Nixon herself testified. She addressed, among other topics, her history with the city department of building and codes, her consumption of alcohol during the relevant time period, and her recollection of specific events. She did not dispute the validity of the test results but maintained that she had not had anything to drink after the Bailey's in the early morning hours and that she had not felt herself to be impaired on the morning of November 16, 2007.

The city then called its own expert witness, Dr. Howard Taylor, a toxicologist. Dr. Taylor rejected the theories put forward by Ms. Nixon to explain her elevated blood alcohol levels–including an impaired ability to metabolize alcohol or the effect of prescription medications. After reviewing the articles presented by Dr. Stafford, Dr. Taylor found no evidence of any documented case of alcohol dehydrogenase deficiency sufficient to explain

the test results in Ms. Nixon's case. He stated that there were tests that could be used to confirm or contradict Ms. Nixon's theory that she had an impaired ability to metabolize alcohol.

The city's last two witnesses were Monty Kapavik, codes inspector, and Gary Whitaker, who was an assistant in the buildings and codes department at the time of Ms. Nixon's termination. Mr. Kapavik testified about an incident prior to the morning in question when Ms. Nixon visited an inspection site and he observed that she appeared to be under the influence of alcohol. Mr. Whitaker testified about his observations of Ms. Nixon at the same inspection site, when he too noticed signs of impairment.

The hearing officer received post-hearing briefs from both parties and entered a decision on August 6, 2008, concluding that "the decision of the City Manager to terminate the employment of the employee is proper in all respects and is sustained." The hearing officer made findings of fact in a separate opinion incorporated by reference in the order.

## Chancery Court

Ms. Nixon filed an action in chancery court requesting a de novo review of the DRB's decision, citing provisions of the city code and DRB rules of procedure. The city filed a motion asserting that the proper standard of review was governed by the Uniform Administrative Procedures Act ("UAPA"). In an order and memorandum opinion filed in February 2009, the chancellor ruled that the proceedings were governed by the UAPA and that the applicable standard of review was found at Tenn. Code Ann. § 4-5-322.

After a hearing in April 2009, the court entered a memorandum opinion on May 5, 2009, and an order on May 22, 2009, affirming the decision of the DRB. Ms. Nixon filed a motion to alter or amend, which the court denied with the exception of changing language in one footnote.

## ISSUES ON APPEAL

On appeal, Ms. Nixon argues that the chancery court erred in refusing to conduct a de novo review of the city's termination of her employment, that the city was estopped from relying on the test results because it violated its own policy, that the city was estopped by its actions from terminating her employment, that she was denied due process, that the city abused its discretion in terminating her employment, and that there was not substantial and material evidence to justify the city's termination of her employment.

STANDARD OF REVIEW

The parties disagree over the proper standard of review in this case. Ms. Nixon argues that the standard of review is determined by a provision of Murfreesboro's city charter, whereas the city argues that the standard of review is determined by the UAPA.

At the time of Ms. Nixon's termination by the city, Section 36 of the Murfreesboro City Charter provided, in pertinent part:

> The judgment and findings of the [Disciplinary Review Board], or a Hearing Officer appointed by the board . . . shall be final and shall be subject to review only for illegality or want of jurisdiction, except that any employee whose dismissal had been ordered or sustained by judgment of the board or a Hearing Officer appointed by the board may . . . file a petition for review in the Chancery Court of Rutherford County, Tennessee, *where the case may be heard DE NOVO* solely upon the certified record.

1993 TENN. PRIV. ACTS CH. 104, § 17; 1997 TENN. PRIV. ACTS CH. 94, § 2 (emphasis added).[3] In asserting that these charter provisions are determinative in this case, Ms. Nixon points to Tenn. Code Ann. § 27-9-101, which addresses the right of review by common law writ of certiorari:

> Anyone who may be aggrieved by any final order or judgment of any board or commission functioning under the laws of this state may have the order or judgment reviewed by the courts, where not otherwise specifically provided, in the manner provided by this chapter.

Ms. Nixon asserts that the phrase "where not otherwise specifically provided" indicates that the provisions of Title 27, Chapter 9 do not apply here since the City of Murfreesboro has a specific charter provision on the review of DRB decisions. The city argues that the standard of review is determined by Tenn. Code Ann. § 27-9-114, which provides for review pursuant to the UAPA.

Like the chancellor, we find Ms. Nixon's position to be erroneous. The language in Tenn. Code Ann. § 27-9-101 upon which Ms. Nixon relies contemplates that the legislature may specifically provide means of review other than the common law writ of certiorari in certain contexts. It does not authorize a private act to supersede the general law. It is a well-established principle of law that "a private act cannot suspend or supersede the general law."

---

[3]These provisions were subsequently deleted by 2009 TENN. PRIV. ACTS CH. 9, § 1.

*Baugh v. Williamson County Hosp. Trs.*, 679 S.W.2d 934, 937 (Tenn. 1984). In *Wilson v. Town of Greeneville*, 509 S.W.2d 495, 497 (Tenn. Ct. App. 1973), there was a conflict between a private act and a previous version of what is now Tenn. Code Ann. § 27-9-114[4] as to how to secure review of the decision of a civil service board, and the court held that the provisions of the statute controlled.

Tenn. Code Ann. § 27-9-114(b)(1) specifically addresses the standard of review applicable to certain proceedings involving public employees:

> Judicial review of decisions by civil service boards of a county or municipality which affects the employment status of a county or city civil service employee shall be in conformity with the judicial review standards under the Uniform Administrative Procedures Act, § 4-5-322.

In *Huddleston v. City of Murfreesboro*, 635 S.W.2d 694, 696 (Tenn. 1982), the court stated that the predecessor to what is now Tenn. Code Ann. § 27-9-114, which provided for review by common law writ of certiorari, was "the exclusive remedy for judicial review of administrative determinations respecting the employment status of such employees." We have concluded that Tenn. Code Ann. § 27-9-114(b) governs the standard of review in this case and controls over any conflicting provisions of the city charter.[5]

Pursuant to Tenn. Code Ann. § 27-9-114(b)(1), the standard of review in this case is found at Tenn. Code Ann. § 4-5-322, part of the UAPA. Tenn. Code Ann. § 4-5-322(h) states:

> The court may affirm the decision of the agency or remand the case for further proceedings. The court may reverse or modify the decision if the rights of the petitioner have been prejudiced because the administrative findings, inferences, conclusions or decisions are:

---

[4]Under this previous version of the statute, review was by common law writ of certiorari. *See City of Memphis v. Civil Serv. Comm'n*, No. W2003-02799-COA-R3-CV, 2004 WL 3021120, at *3 n.7 (Tenn. Ct. App. Dec. 29, 2004); *Wilson v. Town of Greenville*, 509 S.W.2d at 496.

[5]Apart from her reliance on the city charter, Ms. Nixon does not otherwise challenge the applicability of the provisions of Tenn. Code Ann. § 27-9-114. Our Supreme Court has made clear that, for Tenn. Code Ann. § 27-9-114(b)(1) to apply, "there must (1) be a proceeding before a 'civil service board' and (2) a decision that affects the 'employment status' of a civil service employee." *Tidwell v. City of Memphis*, 193 S.W.3d 555, 559 (Tenn. 2006). The statute has been found applicable to municipal entities even though they are not called civil service boards if they effectively act as civil service boards "by making decisions that affect a worker's employment status." *Id.* at 562.

(1) In violation of constitutional or statutory provisions;

(2) In excess of the statutory authority of the agency;

(3) Made upon unlawful procedure;

(4) Arbitrary or capricious or characterized by abuse of discretion or clearly unwarranted exercise of discretion; or

(5) (A) Unsupported by evidence that is both substantial and material in the light of the entire record.

(B) In determining the substantiality of evidence, the court shall take into account whatever in the record fairly detracts from its weight, but the court shall not substitute its judgment for that of the agency as to the weight of the evidence on questions of fact.

The UAPA's narrow standard of review for an administrative body's factual determinations "suggests that, unlike other civil appeals, the courts should be less confident that their judgment is preferable to that of the agency." *Wayne County v. Tenn. Solid Waste Disposal Control Bd.*, 756 S.W.2d 274, 279 (Tenn. Ct. App. 1988). This court, like the trial court, must apply the substantial and material evidence standard to the agency's factual findings. *City of Memphis v. Civil Serv. Comm'n*, 239 S.W.3d 202, 207 (Tenn. Ct. App. 2007); *Bobbitt v. Shell*, 115 S.W.3d 506, 509-10 (Tenn. Ct. App. 2003). With respect to questions of law, our review is de novo with no presumption of correctness. *County of Shelby v. Tompkins*, 241 S.W.3d 500, 505 (Tenn. Ct. App. 2007).

ESTOPPEL

Ms. Nixon makes two estoppel arguments: (1) that the city is estopped from relying on the results of blood alcohol testing because it violated its own policy by failing to provide a medical review officer ("MRO"); and (2) that the city is estopped from terminating Ms. Nixon's employment by its actions in allowing her to work after there was a reasonable suspicion that she was intoxicated. For the reasons set out below, we find no merit in either argument.

To establish equitable estoppel, a doctrine that is generally disfavored, a party must prove that the defendant did the following: (1) engaged in conduct amounting to false representation or concealment of material facts or conduct calculated to give the impression that the facts are otherwise than the defendant later attempts to assert; (2) with an expectation

-13-

that the other party would act upon that conduct; and (3) with actual or constructive notice of the actual facts. *Melton v. City of Lexington*, No. W2005-01167-COA-R3-CV, 2006 WL 2032558, at *7 (Tenn. Ct. App. July 20, 2006); *Consumer Credit Union v. Hite*, 801 S.W.2d 822, 825 (Tenn. Ct. App. 1990). The party invoking equitable estoppel must have a lack of knowledge of the truth and a lack of means of gaining that knowledge, must have relied upon the defendant's conduct, and must have prejudicially changed position by virtue of that reliance. *Melton*, 2006 WL 2032558, at *7; *Faust v. Metro. Gov't of Nashville*, 206 S.W.3d 475, 497-98 (Tenn. Ct. App. 2006).

Equitable estoppel does not apply to local governments to the same extent it might apply to private individuals. *Paduch v. City of Johnson City*, 896 S.W.2d 767, 772 (Tenn. 1995); *Shahan v. Franklin County*, No. M2002-00725-COA-R3-CV, 2003 WL 23093836, at *3 (Tenn. Ct. App. Dec. 30, 2003). The doctrine applies to governmental entities only in "very exceptional circumstances." *Paduch*, 896 S.W.2d at 772. The exceptional circumstances required to justify application of equitable estoppel to a public entity occur when that entity "took affirmative action that clearly induced a private party to act to his or her detriment, as distinguished from silence, non-action or acquiescence." *Id.* at 772-73 (quoting *Bledsoe County v. McReynolds*, 703 S.W.2d 123, 125 (Tenn. 1985)). The proof must show "the existence of an implied contract or that the government has induced a party to relinquish a cause of action." *Shahan*, 2003 WL 23093836, at *4.

(1)

With respect to the city's failure to provide a medical review officer, Ms. Nixon argues that "if the City had followed its own policy these test results would have never been sent to the City and Ms. Nixon would not have been fired." This position is flawed for a number of reasons.

The city disputes that it was required to provide an MRO to Ms. Nixon as part of the alcohol testing procedure but concedes that there was some ambiguity in its policy in the employee handbook.[6] The definitional section of the policy stated that the MRO was "responsible for receiving and reviewing laboratory results generated by an employer's drug testing program and evaluating medical explanation for certain drug testing results." Later in the policy, however, there were some statements suggesting that an MRO would be provided for both drug and alcohol testing. The city emphasizes that, in its definition of alcohol use, the policy expressly stated: "THERE IS NO MEDICATION EXCEPTION." Moreover, the city argues, the policy provided that the city's drug and alcohol procedures

---

[6]The policy was later amended to remove any reference to the use of an MRO with respect to alcohol testing.

-14-

would be consistent with federal regulations set forth in 49 C.F.R. Part 40, and that these regulations prohibit the use of an MRO in the context of alcohol testing.

Even assuming that the city's policy required it to provide an MRO to Ms. Nixon, we have concluded that her estoppel argument fails for lack of any prejudice to her as a result of her alleged reliance on the city's obligation to provide an MRO to review her test results. In the context of drug testing, the MRO will review positive test results to determine whether prescription or over-the-counter medications taken by the employee might have caused the positive result. If the employee's explanation is not satisfactory, the MRO reports the positive results to the employer. In the context of alcohol testing, however, there is no exception for medications: an employee is not permitted to have alcohol in his or her blood over a certain level while at work, regardless of whether it came from a cocktail or a bottle of mouthwash.

Ms. Nixon's position is that alcohol dehydrogenase deficiency or Tylenol slowed her body's elimination of alcohol ingested the previous night. Even if an MRO had been provided to Ms. Nixon, the MRO could not properly have declined to send the positive test results on to the city based on these theories. Ms. Nixon's opportunity to present these theories came at the DRB hearing. It should also be noted that Ms. Nixon herself obtained the blood testing, the results of which corroborated the breath tests, and that any MRO requirement did not apply to testing voluntarily obtained by Ms. Nixon. We find no basis to estop the city from relying on the breath test results.

(2)

We likewise find no merit in Ms. Nixon's argument that the city is estopped from terminating her employment due to its action in allowing her to continue working for several hours after Mr. Ives first developed a reasonable suspicion that she was intoxicated.

The specific facts cited by Ms. Nixon in support of this argument are that, even after he became suspicious that Ms. Nixon was under the influence of alcohol, Mr. Ives continued to rely on her to be his main witness for the scheduled hearing. It was not until Mr. Ives and Ms. Nixon returned from the courthouse after the hearing was continued that Mr. Ives reported his concerns to Ms. McGannon. Mr. Ives conceded at the DRB hearing that, in hindsight, he probably should have reported his concerns sooner. The city emphasizes that Mr. Ives had no supervisory authority with respect to Ms. Nixon and had no authority to waive any of the city's rights under the drug and alcohol policy. The city further argues that, although its drug and alcohol policy contemplates prompt action once reasonable suspicion exists, the policy requires only that testing be provided within eight hours of the determination of reasonable suspicion.

In our view, the most obvious flaw in Ms. Nixon's argument is that she suffered no harm as a result of the city's delay in informing her of its reasonable suspicion.[7] There is nothing in the record to suggest that this delay was detrimental to Ms. Nixon in any way. To the contrary, it would seem that the delay was of benefit to her by allowing additional time for her body to metabolize the alcohol. Furthermore, Ms. Nixon consented to the testing and admits that the positive results were valid. She attempts to explain and excuse the test results based upon a slowed rate of elimination of alcohol from her system.

In light of the absence of harm to Ms. Nixon and of the exceptional circumstances required to apply the doctrine of equitable estoppel to a governmental entity, we reject Ms. Nixon's estoppel arguments.

DUE PROCESS

Ms. Nixon makes three basic arguments to support her position that she was denied due process in the course of the proceedings leading to her termination: (1) that the DRB hearing officer erred in considering evidence of alleged prior acts; (2) that the DRB erred in deciding, in the middle of the hearing, to allow the hearing officer to hear the remaining evidence and to decide the case; and (3) that the hearing officer was not properly qualified under the UAPA. We note at the outset that Ms. Nixon does not cite a single legal authority to support these arguments. Seeing no clear constitutional violations, this court will endeavor only to address Ms. Nixon's assertions, not to spend judicial resources fleshing out her position.

Ms. Nixon's first argument is that the hearing officer erred in failing to exclude certain testimony of alleged prior issues with alcohol consumption while performing work functions. She emphasizes that there was no written record of these incidents, which she argues was required under the city's drug and alcohol policy. While acknowledging that she agreed to allow some testimony of prior incidents,[8] including testimony concerning her demeanor when inspecting a job site and at some planning commission meetings, Ms. Nixon asserts that the actual testimony went further than anticipated by including two other alleged instances and was "highly inflammatory and prejudicial." The city counters that there was no dispute that Ms. Nixon was in violation of the policy on November 16, 2007, (although

_____

[7]It is also difficult to ascertain what representation or concealment of material facts was allegedly made by the city and relied upon by Ms. Nixon. She was arguably in the best position to know whether she was under the influence of alcohol.

[8]According to Ms. Nixon, her attorney had an agreement with counsel for the city regarding the admission of some testimony concerning alleged prior alcohol use. We find nothing in the record to reflect this agreement and, therefore, cannot consider it.

she presented evidence to justify the violation), and that the evidence of prior incidents was relevant to the appropriate disciplinary action. Furthermore, the city asserts that the testimony by Mr. Aydelott, the evidence to which Ms. Nixon most strongly objects, was relevant to rebut Ms. Nixon's assertion that she did not have the opportunity to consume alcohol on the morning in question. Mr. Aydelott testified that Ms. Nixon told him that she sometimes used miniature liquor bottles to bring alcohol to meetings.

County and city administrative boards have broad discretion to determine the admissibility and weight of evidence. See *Case v. Shelby County Civil Serv. Merit Bd.*, 98 S.W.3d 167, 176 (Tenn. Ct. App. 2002); *Anderson v. Carter*, 512 S.W.2d 297, 306 (Tenn. Ct. App. 1974). Moreover, the hearing officer stated in his opinion that "no weight was given to any alleged incidents of impairment by the Employee while on City business as such was not substantiated by any information contained in the Employee's records." We find no basis for Ms. Nixon's assertion that she was denied due process by virtue of the admission of this evidence.

Ms. Nixon's second argument is that the DRB erred by changing the decision maker to the hearing officer alone, a decision allowed by the city's charter provisions governing the DRB. According to Ms. Nixon's position, this action created "the real danger that the Hearing Officer did not consider all of the evidence with the same scrutiny or for the same purposes." Ms. Nixon did not object when the DRB made this election at the end of the first day of the hearing. Neither did she exercise her right under the city charter to seek review of the hearing officer's decision to the full DRB. We find no constitutional implications here, and if there are any, they were waived.

Finally, Ms. Nixon argues that the DRB hearing officer, Mr. Duncan, was not qualified to act as the hearing officer.[9] She relies on the UAPA's definition of hearing

---

[9]Ms. Nixon's brief also makes the following statement: "[I]t is also important to note that the person conducting and hearing the initial 'Due Process' hearing was City Manager, Roger Haley, the person who fired Ms. Nixon; certainly not an objective[,] fair or impartial judge." We disagree with the premise of Ms. Nixon's statement and with the trial court's characterization of the city manager's role at the due process hearing. Under the city charter, the city manager has the ultimate authority to hire and fire city employees. After getting the results of Ms. Nixon's alcohol tests, Mr. Haley put her on administrative leave and stated that termination was his *proposed* disciplinary action. At that point, Ms. Nixon was given the opportunity to present her case to Mr. Haley, who ultimately decided to terminate her employment. Thus, the city manager was not reviewing his own decision; rather, in accordance with the city charter, he was getting all of the relevant information and giving Ms. Nixon the chance to be heard prior to making his decision. Thus, Mr. Haley conducted a pre-termination hearing, also known as a *Loudermill* hearing, a procedure required prior to depriving someone of a significant property interest. *Cleveland Bd. of Educ. v. Loudermill*, 470 U.S. 532, 542 (1985); *Davis v. Shelby County Sheriff's Dep't*, 278 S.W.3d 256, 259-60 (Tenn. 2009).

-17-

officer: "an agency member, agency employee or employee or official of the office of the secretary of state, not licensed to practice law . . . ." Tenn. Code Ann. § 4-5-102(4). Mr. Duncan was appointed in accordance with a city charter provision stating that a hearing officer appointed by the DRB "shall be a licensed attorney who shall be compensated at an hourly rate." Ms. Nixon argues that Mr. Duncan could not properly act as a hearing officer because he was an attorney and was not an employee of the City of Murfreesboro or an official of the secretary of state.

We find no merit in this argument. The UAPA defines a hearing officer as a non-attorney to distinguish the position from an administrative judge, who must be licensed to practice law. Tenn. Code Ann. § 4-5-102(1). Contested case hearings may be conducted by an administrative judge or a hearing officer. Tenn. Code Ann. § 4-5-301(a). In addition, the UAPA provisions governing contested case hearings contemplate that an agency may be authorized by law to conduct a contested case hearing "by an administrative judge, hearing officer or *similar officer* from the agency." Tenn. Code Ann. § 4-5-301(e) (emphasis added).[10] The DRB of the City of Murfreesboro was authorized by private act to appoint and pay a licensed attorney to act as a hearing officer. 1997 TENN. PRIV. ACTS CH. 94, § 2. Furthermore, Ms. Nixon did not object to Mr. Duncan's qualifications at the hearing, nor did she exercise her right to have his decision reviewed by the full DRB. We fail to see how Ms. Nixon's due process rights were compromised.

ABUSE OF DISCRETION

Ms. Nixon next argues that the city abused its discretion in terminating her employment instead of imposing a lesser form of discipline.

Pursuant to Tenn. Code Ann. § 4-5-322(h), a court may reverse or modify an agency decision if the rights of the petitioner were prejudiced because the administrative findings, inferences, conclusions or decisions are "[a]rbitrary or capricious or characterized by abuse of discretion or clearly unwarranted exercise of discretion." Tenn. Code Ann. § 4-5-322(h)(4). The standard of review under subsection (4) of Tenn. Code Ann. § 4-5-322(h) has been described as follows:

> In its broadest sense, the standard requires the court to determine whether the administrative agency has made a clear error in judgment. An arbitrary [or capricious] decision is one that is not based on any course of reasoning or exercise of judgment, or one that disregards the facts or circumstances of the

---

[10]Where no such authority has been conferred, a contested case hearing is to be conducted by an administrative judge or hearing officer employed by the secretary of state. Tenn. Code Ann. § 4-5-301(e).

case without some basis that would lead a reasonable person to reach the same conclusion.

*City of Memphis v. Civil Serv. Comm'n*, 216 S.W.3d 311, 316 (Tenn. 2007). This court has previously noted that five of the specific review criteria in Tenn. Code Ann. § 4-5-322(h) are examples of the kind of decisionmaking that would constitute an abuse of discretion:

> Acting in violation of constitutional or statutory provisions [Tenn. Code Ann. § 4-5-322(h)(1)] would clearly constitute an "abuse of discretion," as would acting in excess of the decision-maker's statutory authority [Tenn. Code Ann. § 4-5-322(h)(2)], using an unlawful procedure [Tenn. Code Ann. § 4-5-322 (h)(3)], or making a decision that is unsupported by the evidence [Tenn. Code Ann. § 4-5-322(h)(5)].

*Office of Attorney Gen. v. Tenn. Regulatory Auth.*, No. 2003-01363-COA-R12-CV, 2005 WL 3193684, at *8 n.20 (Tenn. Ct. App. Nov. 29, 2005).

The City of Murfreesboro's drug and alcohol policy is described in section 3005 of the city's employee handbook. Subsection (c)(1)(A) states that the city's policy "can be described as a 'Zero Tolerance Drug Policy.'" Under subsection (c)(1)(B)(i), "[n]o employee shall report to work with an alcohol concentration of 0.02 or greater . . . ." Subsection 3005(c)(13) states that violation of the drug and alcohol policy "is strictly prohibited and constitutes grounds for disciplinary action, including termination . . . ." The latter subsection further sets out the following factors to be considered by the city in determining "to what extent an employee will be returned to duty, suspended, disciplined, or discharged" for a violation of the drug and alcohol use policy:

> (A) The degree to which the nature of any criminal charges reduce the City's ability to maintain a safe and efficient working environment.
>
> (B) The degree to which criminal charges unreasonably undermine public confidence in the City's operations.
>
> (C) The degree to which the nature of the criminal charges unreasonably endangers the safety of other City employees, and/or the public.
>
> (D) The nature of the criminal charges.
>
> (E) The nature of the employee's job at the City.

(F) Whether the criminal charges constitute a breach of the employee's oath of office, departmental regulations, or qualifications for the employee's position.

(G) Whether the employee is a police officer, Safety Sensitive Employee, CDL Employee, or works with or around children.

(H) The existence of any explanatory or mitigating facts or circumstances.

(I) Whether the employee promptly reports the charge.

(J) Whether the misconduct involves illegal drugs or misuse of alcohol.

(K) Whether alcohol misuse involves alcoholic beverages or medication(s) containing alcohol.

(L) Whether an employee has previously violated this policy.

(M) Any other facts relevant to the employee including, but not limited to, years of service and record of performance with the City.

Ms. Nixon was classified as a safety-sensitive employee. The Safety Sensitive Employee Acknowledgment form signed by Ms. Nixon stated that compliance with section 3005 was a condition of employment and that "[v]iolation will likely result in termination of my employment with the City."

Ms. Nixon asserts, and we agree, that the city's policy allows for discretion in determining what form of discipline is most appropriate. She further asserts that Mr. Haley disregarded the city policy by applying his own personal policy of terminating any employee found to have violated the drug and alcohol policy.[11] This case, however, presents us with the narrow issue of whether the DRB's approval of the city's initial decision to terminate Ms. Nixon constitutes an abuse of discretion. We will focus our analysis on that question.

---

[11]The testimony established only one instance in which Mr. Haley had terminated an employee for a drug and alcohol policy violation, and the employee challenged the termination through the administrative review process. Other employees found in violation of the drug and alcohol policy had chosen to resign.

According to Ms. Nixon's analysis, 11 or 12 of the 13 factors listed in subsection 3005(c)(13) weigh in favor of a form of discipline less severe than termination.[12] This reasoning is flawed in several respects. This court is to determine whether the city's decision to terminate Ms. Nixon represents an abuse of discretion, not whether another result might have been proper. There is nothing in the city's policy to suggest that the factors listed in subsection 3005(c)(13) are to be given equal weight and the result determined by a count of the pro's and con's. Furthermore, as discussed below, the city's decision is supported by legitimate reasons.

In terminating Ms. Nixon, the city manager applied the following analysis of the factors:

I have carefully considered the factors set forth in Section 3005(c)(13) including the fact that you are classified as a safety sensitive employee. Included in my consideration has been that you have been a long standing and valued employee for the City of Murfreesboro who has served the City well in your leadership of the Buildings and Codes Department for the past nineteen years. As you will recall I was one of those persons involved in your hiring and I have had much respect for your abilities. However, as City Manager it is my responsibility to see that the policies of the City are applied equally to all employees regardless of their position. It has consistently been my policy that termination is the appropriate discipline when the breath alcohol level of an employee has been .04 or greater while that employee has been on the job. In reaching my discipline decision, I am also mindful of the testimony at the due process hearing of witnesses Gary Whitaker, Monty Kapavik, and Joseph Aydelott concerning previous incidences of your impairment while on city business from the use of alcohol. You and I previously discussed one of these incidents and I advised you that the use of alcohol in such a manner while on City business would not be tolerated. However, at the hearing you indicated you had no recollection of this meeting occurring.

In his opinion sustaining the city manager's decision to terminate Ms. Nixon's employment, the DRB hearing officer noted in particular that she was both a safety-sensitive employee and a department head, that her years of service and work performance had been considered, that

_____

[12]Because we need only determine whether the city abused its discretion, we decline to consider the facts relevant to each factor. We do not, however, share Ms. Nixon's view of how many factors might weigh in her favor.

there was no indication of any disparate treatment among employees, and that the safety employee acknowledgment form clearly stated that termination was the likely result of a violation.[13]

The only case cited by Ms. Nixon in support of her abuse of discretion argument is *City of Memphis v. Civil Service Commission*, 239 S.W.3d at 202, a case that actually supports the decision of the chancellor in this case. In *City of Memphis*, the city terminated a police officer because of her involvement in a public altercation. *Id.* at 203. The city's civil service commission reversed the city's decision as unreasonable, but the chancellor reversed the civil service commission's decision on the basis that its actions were arbitrary and capricious. *Id.* This court held that the civil service commission's decision was supported by substantial and material evidence and that the chancellor erred in finding the commission's decision to be arbitrary and capricious. *Id.* at 211. In the present case, as in *City of Memphis*, the decision under review by the courts is that of the administrative body. The courts must determine whether the decision of the DRB or civil service commission is arbitrary and capricious or is not supported by substantial and material evidence.

Ms. Nixon also makes the argument that her elevated blood alcohol level "caused no harm to no one [sic], it did not result in any of the concerns the policy is designed to prevent." She fails to acknowledge, however, that one of the policy's stated goals is "to preserve the confidence placed in the City by its employees and the public." We have no trouble accepting the city's position that "[t]ermination of employment for intoxication of more than three times the limit established by City policy while on the job in the position of the director of the Buildings and Codes Department is not arbitrary but consistent with the [City's] policy."[14]

## SUBSTANTIAL AND MATERIAL EVIDENCE

Ms. Nixon's final argument is that there was not substantial and material evidence to justify her termination.

Substantial and material evidence has been defined as "such relevant evidence as a reasonable mind might accept as adequate to support the rational conclusion and such as to

---

[13]The city noted in its brief that, as an employer, it did not want to send a message "that there is one standard of conduct applied to non-supervisory employees for alcohol abuse and a different standard applied to supervisors or department heads."

[14]Since the policy prohibited an alcohol concentration of 0.02 or greater and testing showed Ms. Nixon to have a concentration of over 0.13, it appears that her level was over six times the limit established under the policy.

furnish a reasonably sound basis for the actions under consideration." *Dickson v. City of Memphis Civil Serv. Comm'n*, 194 S.W.3d 457, 464 (Tenn. Ct. App. 2005). The substantial and material evidence standard requires "something less than a preponderance of the evidence, but more than a scintilla or glimmer." *Id.* (quoting *Wayne County v. Tenn. Solid Waste Disposal Control Bd.*, 756 S.W.3d 274, 280 (Tenn. Ct. App. 1988)). Pursuant to Tenn. Code Ann. § 4-5-322(h)(5)(B), we must "take into account whatever in the record fairly detracts from" the weight of the evidence, but must not substitute our judgment "for that of the agency as to the weight of the evidence on questions of fact." Thus, we must refrain from reweighing the evidence. *City of Memphis*, 239 S.W.3d at 208. Where the agency has conducted a hearing and heard testimony from witnesses, we must give the agency's credibility determinations great weight. *Id.* Furthermore, the substantial and material evidence standard "does not justify reversal of an administrative decision only because the evidence could also support another result." *Id.* A reviewing court "may reject an administrative determination only if a reasonable person would necessarily arrive at a different conclusion based on the evidence." *Id.*

In making her argument, Ms. Nixon lists 25 facts she claims to be "undisputed and unrebutted." These include a number of facts, such as statements regarding her substantial contribution to the buildings and codes department and her unblemished disciplinary record, that are indeed undisputed. With respect to other of the "facts" emphasized by Ms. Nixon, however, the record contains at best conflicting evidence. For example, Ms. Nixon makes the following assertion: "After reporting to work Ms. Nixon was continuously in the presence of or in view of other employees." The evidence in the record is not as conclusive as Ms. Nixon asserts. While several employees stated that they were with Ms. Nixon for most of the morning, there is no proof that her actions were observable every minute of the morning. Ms. Green and Ms. Stem testified that they could not recall whether Ms. Nixon went to the restroom at some point during the morning. In any event, even if the evidence on this point were conclusive, it does not detract from material evidence supporting the finding that Ms. Nixon violated the policy based on her alcohol level.

Ms. Nixon's list of factual assertions includes the following statements regarding the effect of medications:

> Ms. Nixon was taking many medications, several of which were processed through the liver, which controls the metabolism and elimination of alcohol.

> According to Ms. Nixon's primary treating physician three of those drugs, Librax, her antibiotic and Darvocet (containing very large doses of Tylenol) impeded Ms. Nixon's ability to metabolize (absorb or eliminate) alcohol.

Ms. Carpenter agreed that there is a phenomenon known as the "Tylenol Effect" and that Tylenol slows down a person's ability to eliminate alcohol.

While Ms. Nixon's primary care physician testified that her medications may have affected her rate of eliminating alcohol from her system, Dr. Stafford testified that the effect of Tylenol, if any, would not have been significant, and Dr. Taylor testified that Tylenol would not have affected the test results. Moreover, even under the assumption that Tylenol could have had some effect, there is no evidence to suggest it would have resulted in the level of alcohol shown in Ms. Nixon's blood tests. No evidence was presented to establish that an enzyme deficiency actually played a role, only that such a phenomenon was possible.

After listing the 25 "facts," Ms. Nixon emphasizes that "[t]here was no evidence that Ms. Nixon consumed any alcoholic beverages while at work or four hours before reporting to work on the date in question," and that the only basis for her termination was her blood alcohol level. Under the city's drug and alcohol policy, having a blood alcohol level above 0.02 constitutes a violation. While the logical explanation for such a blood alcohol level is that the employee consumed alcohol while at work or within four hours of reporting to work, the city was not required to prove that the employee had consumed alcohol during that period. The blood alcohol level alone is sufficient grounds for termination.

The evidence produced by Ms. Nixon to explain the test results was refuted by the city's expert toxicologist. Ms. Nixon asserts that "Dr. Helton [her primary care physician] demonstrated greater knowledge, was able to explain in greater detail, and substantiate his opinions more specifically than Dr. Taylor [the city's toxicologist]." The hearing officer heard all of the evidence, was able to assess the credibility of the various witnesses, and declined to accept the explanation Ms. Nixon offered to justify the objective test results. The hearing officer determined that Ms. Nixon had violated the policy and should be terminated.[15] There is substantial and material evidence to support the conclusions reached by the hearing officer.

---

[15]Ms. Nixon did not request review by the full DRB, so the hearing officer's decision became the board's decision.

CONCLUSION

The decision of the circuit court is affirmed.  Costs of this appeal are assessed against the appellant, Ms. Nixon; execution may issue if necessary.

_____
ANDY D. BENNETT, JUDGE